Fletcher JOHNSON, et ano., Plaintiffs,

v.

NYACK HOSPITAL, et al., Defendants.

No. 94 Civ. 7464 (LAK).

United States District Court, S.D. New York.

June 27, 1995.

George C. Clark, Annemarie C. Scanlon, Reed Smith Shaw & McClay, Washington, DC, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, for plaintiffs.

Ronald S. Rauchberg, Francis D. Landrey, Patricia J. Clarke, Mark Monack, Proskauer Rose Goetz & Mendelsohn LLP, New York City, for defendants.

## OPINION

KAPLAN, District Judge.

Hospital staff privileges are essential to the practice of most, perhaps all, medical specialties. Those responsible for extending or revoking staff privileges thus stand at a critical point in the provision of medical care. They bear a weighty responsibility for protecting the public against incompetent and negligent practitioners. At the same time, the power they wield may be abused for any of a panoply of reasons that may imbue human relationships, not least of them racial, religious and ethnic bias, anticompetitive motives, and personal animus.

On February 10, 1987, defendant Nyack Hospital revoked the thoracic and vascular surgery privileges of plaintiff Fletcher Johnson, M.D. Dr. Johnson, an African–American, claims that the decision was the product of anticompetitive motives and racial bias. The defendants contend that Dr. Johnson's privileges were terminated properly on the basis of professional incompetence and negligence and denies Dr. Johnson's charges.

Dr. Johnson, who has continued to enjoy general surgical privileges at Nyack, and his wholly-owned real estate company here seek damages under the federal antitrust and civil rights laws and on State law theories. Defendants move for summary judgment. They contend, in the main, that they are immune from the antitrust claims under the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11111 *et seq.* (1988), and that all of plaintiffs' claims are barred by the statute of limitations.

### Facts

This is the third lawsuit, and the second in this Court, in which Dr. Johnson has sought judicial relief with respect to the 1987 revocation of his vascular and thoracic surgery privileges. His 1987 Article 78 proceeding in the New York Supreme Court was dismissed for failure to exhaust administrative remedies. On February 7, 1990, after further proceedings at Nyack Hospital, Dr. Johnson sued the same defendants in this Court, claiming that the defendants' actions violated the antitrust laws. No civil rights claims were asserted. Judge Sweet granted defendants' motion for summary judgment dismissing the complaint without prejudice for failure to exhaust administrative remedies, and his decision was affirmed by the Second Circuit on the basis that Dr. Johnson's complaint was within the primary jurisdiction of the New York State Public Health Council

("PHC"). *Johnson v. Nyack Hospital,* 773 F.Supp. 625 (S.D.N.Y.1991), *aff'd on other grounds,* 964 F.2d 116 (2d Cir.1992) ("*Johnson I* "). Inasmuch as the details of the proceedings that preceded the filing of *Johnson I* are described in Judge Sweet's opinion, familiarity with which is assumed, there is no need to repeat them here. The Court therefore picks up the thread following Judge Sweet's decision in September 1990.

On January 14, 1992, the New York State Office of Professional Medical Conduct ("OPMC"), a body that is distinct from the PHC and that is responsible for bringing charges against physicians and considering revocation or limitation of their licenses,[1] preferred charges against Dr. Johnson and gave notice of a hearing that could have resulted in revocation of his license to practice medicine. The hearing commenced on February 10, 1992 and continued through November 17, 1992, ultimately covering a total of twenty one hearing days. The OPMC hearings thus were well under weigh when the Second Circuit affirmed Judge Sweet's decision on May 11, 1992.

Notwithstanding the Second Circuit's holding that Dr. Johnson's claim was within the primary jurisdiction of the PHC and that the claim was not cognizable in federal court absent prior resort to that body, Dr. Johnson did not proceed promptly to the PHC. Although his brief in this Court suggested other reasons,[2] Dr. Johnson's counsel frankly acknowledged at oral argument that plaintiff made a tactical judgment that recourse to the PHC was unlikely to be successful as long as the charges pending against him in the OPMC remained unresolved. He therefore delayed. (May 30, 1995 Tr. at 51)

The OPMC rendered its decision on May 6, 1993. Each side claims the decision as a victory, as the OPMC rejected most of the charges against Dr. Johnson but found that he had been guilty of negligence on two occasions and incompetence on one.[3] Moreover, Dr. Johnson places great weight on a letter from the hearing panel to the OPMC that was highly critical of the Nyack Hospital peer review proceedings. For purposes of this motion, however, it is immaterial who "won." The fundamental point is that Dr. Johnson did not even file a complaint with the PHC—which the Second Circuit had held on May 11, 1992 had to be his initial step on the road to a federal forum—until August 9, 1993. Thus, Dr. Johnson waited approximately fifteen months after the Second Circuit decision and three months after the OPMC decision before resorting to the PHC.

After proceedings the details of which are not material here, the PHC finally ruled on September 7, 1994. While it appears that some members of the Council were concerned about one aspect of the 1987 proceedings at Nyack Hospital, there were not sufficient votes for the Council either to credit or reject Dr. Johnson's complaint. Accordingly, the PHC took no action whatever.

In February 1994, following the OPMC decision but before the PHC ruling, Dr. Johnson applied for reinstatement of his vascular and thoracic surgery privileges. The application was reviewed by Nyack's Director of Surgery, Dr. Simon, who determined that Dr. Johnson had not demonstrated current clinical competence in the field and that the application should be denied. Three hospital committees reviewed Dr. Simon's recommendation and agreed that the application should be denied, and the Board of Trustees so concluded.

Dr. Johnson appealed the decision, as he was entitled to do under the By–Laws. The hospital appointed former United States District Judge Kenneth Conboy as the hearing officer. At a conference prior to the hearing,

---

1. N.Y.Pub. Health L. § 230, subd. 11 (McKinney 1990 & Supp.1992).

2. Dr. Johnson's brief argued that his delay in seeking a PHC ruling was justified because the PHC lacked jurisdiction and, in any case, because the PHC—which in Dr. Johnson's view would not itself examine the medical issues relating to his care of patients—would benefit from the detailed review then being conducted by the

OPMC. The first of these arguments was rejected by the Second Circuit in *Johnson I*. 964 F.2d at 121–22.

3. The parties are at loggerheads over the extent to which the charges rejected by the OPMC were bases for the hospital's revocation of Dr. Johnson's privileges. In view of the disposition of this motion, there is no need to address that issue.

Judge Conboy asked Dr. Johnson to identify the information he had submitted with his application and questioned Dr. Johnson as to why he had failed to present evidence of current clinical competence beyond the assertions of his counsel. (Tr. Nov. 14, 1994, Docket Item No. 28, at 15–17, 20, 22, 24, 68–69, 72–74) Dr. Johnson said that he was prepared to offer such proof at the hearing and identified several witnesses whom he said would testify in his behalf.

The Hospital contended before Judge Conboy that the hearing officer's function was only to determine whether the Hospital had acted properly given the record before it, while Dr. Johnson argued that he was entitled to a *de novo* review. Judge Conboy indicated agreement with the Hospital, stating that the time for Dr. Johnson to have submitted evidence of his clinical competence "was at the application stage." (*Id.* at 75) He nevertheless afforded Dr. Johnson the opportunity to submit affidavits from those doctors so that he could rule as to whether he would permit them to testify. (*Id.* at 77–78) At the subsequent hearing, Johnson offered letters, rather than affidavits, from five physicians. Judge Conboy ruled that they were inadmissible and, in any case, not probative of Dr. Johnson's current competence. (Tr. Dec. 19, 1994, Docket Item No. 28, at 59–60, 78) Dr. Johnson's counsel then stated that:

"Given the state of the record, given the rulings, I don't think I can get the decision of the hospital changed at this point in time . . .

"For that reason, it is my intention to withdraw the appeal at this point, to reapply, I'm assuming the hospital will act in an expeditious fashion, and if we need to do anything after that, we will do what we [have] to do after that." (*Id.* at 80–81) Dr. Johnson has not reapplied.

This action was filed on October 14, 1994, which was after the PHC had declined to act and during the pendency of the proceedings with respect to Dr. Johnson's application for reinstatement of his privileges. The amended complaint contains five causes of action. Counts I and II charge that the 1987 revocation of privileges violated Sections 1 and 2 of the Sherman Act, respectively. Counts III and IV allege that the revocation of Dr. Johnson's privileges and the 1994 denial of reinstatement violated 42 U.S.C. §§ 1981 and 1985(3). Count V seeks recovery for the same conduct on the theory that the defendants tortiously interfered with Dr. Johnson's economic advantage and is brought pursuant to the Court's supplemental jurisdiction.

## Discussion
### The 1987 Revocation of Privileges
#### Antitrust Claims

■ Section 4B of the Clayton Act, 15 U.S.C. § 15b, provides that a private damage action under the antitrust laws "shall be forever barred unless commenced within four years after the cause of action accrued." The cause of action accrues when a defendant commits an act that violates the antitrust laws and injures the plaintiff. *E.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338–39, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). As Dr. Johnson's privileges were revoked on February 10, 1987, effective immediately, any cause of action that arose under the antitrust laws by reason of the revocation accrued on that date.

Dr. Johnson did not commence *Johnson I* until February 7, 1990. By that time, approximately three years of the four year period of limitations had expired. The dispositive question therefore is whether the statute began to run again after the Second Circuit affirmed Judge Sweet's dismissal of *Johnson I* and, if so, when.

■ Dr. Johnson, as nearly as the Court can determine, makes two analytically distinct arguments in support of the proposition that this action was timely filed. First, he seems to contend that the Second Circuit's affirmance of the District Court's dismissal without prejudice in substance tolled the statute of limitations until the PHC ruled. In any case, he argues, the statute was equitably tolled as long as he diligently pursued his remedy in the PHC which, he asserts, he did.

The first of plaintiff's arguments cannot be reconciled with *Jewell v. County of Nassau,*

917 F.2d 738 (2d Cir.1990). That was a Section 1983 action in which the plaintiff alleged that he had been arrested and convicted and his home searched unlawfully. The case was commenced one day before the expiration of the statute of limitations. The magistrate judge recommended dismissal without prejudice pending the outcome of the State court appeal of Jewell's conviction. Jewell objected on the ground that dismissal would result in the recommencement of the running of time and therefore in the bar of his action. The District Court dismissed, although it purported to toll the statute of limitations. But the Second Circuit reversed, holding that the District Court lacked the power to toll the statute and that:

> "[w]here a plaintiff wishes or is required to pursue his claims in succession, rather than concurrently, in the absence of the parties' agreement made to waive the limitary period before it had expired, a judicial stay of the pending suit, rather than dismissal, albeit expressed to be without prejudice, is the only means by which the bar of limitations may be avoided." *Id.* at 740–41.

■ *Jewell* thus stands for two propositions: (1) a federal court ordinarily may not toll the running of a limitations period, and (2) the limitations period begins to run upon the dismissal of an action without prejudice. While Dr. Johnson correctly notes that *Jewell* dealt with the question whether a federal court has the power to toll a period of limitations borrowed from State law, Dr. Johnson cites no authority in support of the argument that this distinction warrants a different result here and the Court has found none. The federal antitrust laws, like the New York statutes in *Jewell,* make no provision for tolling in these circumstances. Even more important, however, neither Judge Sweet nor the Second Circuit, unlike the District Court in *Jewell,* purported to toll the running of the period of limitations in *Johnson I.* The dismissal without prejudice did no more than permit Dr. Johnson to commence a new federal action after recourse to the PHC, subject to whatever defenses—including limitations—there might be. Indeed, any other interpretation of the Second Circuit's decision would require the conclusion that Dr.

Johnson had an unlimited period of time in which to initiate proceedings in the PHC and, for that matter, to commence a new action after obtaining a ruling from the PHC, a manifestly improbable result.

■ Dr. Johnson's contention that the period of limitations was equitably tolled by the Second Circuit's ruling pending his diligent pursuit of a remedy in the PHC fares no better for at least two reasons.

First, it is quite doubtful that the doctrine of equitable tolling applies in these circumstances at all. While the Ninth Circuit in *Mt. Hood Stages, Inc. v. Greyhound Corp.,* 616 F.2d 394 (9th Cir.), *cert. denied,* 449 U.S. 831, 101 S.Ct. 99, 66 L.Ed.2d 36 (1980), held that the antitrust period of limitations was tolled during a plaintiff's pre-suit resort, required by the doctrine of primary jurisdiction, to the Interstate Commerce Commission, the decision has not met with favor in this Circuit or elsewhere. The Second Circuit declined to follow *Mt. Hood* in *Higgins v. New York Stock Exchange,* 942 F.2d 829, 833 (2d Cir.1991), characterizing it "as at best a very narrow ruling, at worst a wholly anomalous decision," and held that the running of the statute on a claim relating to an alleged antitrust violation in the securities business was not tolled by the plaintiff's pre-suit resort to the Securities and Exchange Commission. *See also Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 268–69 (7th Cir.1984).

This Court recognizes that *Higgins,* in a strict sense, is not dispositive because it dealt only with pre-suit resort to an agency with primary jurisdiction rather than post-suit resort, as occurred here. The post-suit situation is different because the filing of the suit puts the defendant on notice of the antitrust claim and may permit the defendant to preserve certain evidence for its defense. *See Higgins,* 942 F.2d at 833. But this difference is insufficient to warrant a different result here. For one thing, pre-suit resort to an administrative agency often puts a prospective defendant on notice of a likely claim almost as surely as service of process. More important, certain of the prejudicial consequences of the passage of time—conse-

quences that statutes of limitation are designed to guard against—cannot be prevented by notice of a claim. Witnesses may die and move out of the jurisdiction and testimony may change, usually as memories dim, quite without regard to whether the defendant is on notice of a claim. Hence, while the argument for tolling pending recourse to an agency with primary jurisdiction is somewhat stronger when recourse occurs after the filing of suit than before, it is only marginally so. The Court therefore holds that the running of the period of limitation was not tolled pending recourse to the PHC. Nor does the Court rest on that ground alone.

■ Dr. Johnson acknowledges that the equitable tolling doctrine, even if applicable, would suspend the running of the limitation period only if he acted with reasonable diligence. (Pl.Br. 38, *citing Singletary v. Continental Illinois National Bank and Trust Co. of Chicago,* 9 F.3d 1236 (7th Cir.1993)). Here, however, Dr. Johnson did not act with reasonable diligence within the meaning of the doctrine.

It is undisputed that three years of the four year limitation period had expired before Dr. Johnson commenced *Johnson I.* Following the Second Circuit's decision, Dr. Johnson then waited the following additional periods before commencing this action: (1) approximately twelve months from May 11, 1992 until the OPMC decision on May 6, 1993, (2) three months from the OPMC decision on May 6, 1993 until filing his PHC complaint on August 9, 1993, (3) thirteen months from the filing of his PHC complaint on August 9, 1993 until the PHC ruling on September 7, 1994, and (4) approximately one month from the PHC decision on September 7, 1994 until the filing of this action on October 14, 1994.

Even accepting *arguendo* Dr. Johnson's logic concerning the delay in his resort to the PHC, there is no substantial argument for holding that the limitation period was tolled during the four months attributable to the delays between the OPMC decision and the filing of the PHC complaint and between the PHC ruling and the filing of this action. Nor does the Court accept Dr. Johnson's conten-

tion that the period was tolled for the twelve months during which he delayed going to the PHC because he preferred first to resolve the OPMC charges against him. As the cases Dr. Johnson cites hold, equitable tolling "permits a plaintiff to sue after the statute of limitations has expired *if through no fault or lack of diligence on his part he was unable to sue before,* even though the defendant took no active steps to prevent him from suing." *Singletary,* 9 F.3d at 1241 (emphasis added); *accord, Heck v. Humphrey,* 997 F.2d 355, 357 (7th Cir.1993).

While it is not for the Court to question counsel's tactical judgment that Dr. Johnson perhaps stood a better chance of success before the PHC if the license revocation proceeding first were concluded, the fact remains that Dr. Johnson was not foreclosed by that proceeding from going to the PHC. He decided to delay in the pursuit of his own interests and must bear the consequences of that decision. Nor is there anything inequitable in this conclusion. If Dr. Johnson's decision were sufficient to toll the running of the limitation period, then by his own action he would have delayed resolution of the claim against Nyack Hospital for another year or more—a period during which both sides are at risk that the vicissitudes of time will prejudice their respective cases. While Dr. Johnson chose to run that risk for himself, there is no basis for concluding that he had the right to subject the defendants to that risk by his unilateral action. In consequence, even if the doctrine of equitable tolling were applicable here, the Court would hold that Dr. Johnson did not act with reasonable diligence in failing to commence proceedings in the PHC between May 6, 1992 and August 9, 1993 and in failing to commence this action between the date of the PHC decision, September 7, 1994, and October 14, 1994. These periods, when combined with the three years that elapsed prior to the commencement of *Johnson I,* exceed the statutory limitation period even without regard to the period during which the matter was pending in the PHC as to which the Court need not express any opinion. Ac-

cordingly, the antitrust claims are barred by the statute of limitations.

*Civil Rights Claims*

■■■ The statute of limitations for claims brought under Sections 1981 and 1985 of the Civil Rights Act is three years. *Tadros v. Coleman,* 898 F.2d 10, 12 (2d Cir.), *cert. denied,* 498 U.S. 869, 111 S.Ct. 186, 112 L.Ed.2d 149 (1990); *Gilliard v. New York Public Library System,* 597 F.Supp. 1069, 1076 (S.D.N.Y.1984). The claim accrues and the limitation period begins to run when the plaintiff has notice of the act that is claimed to have caused the injury. *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981); *Delaware State College v. Ricks,* 449 U.S. 250, 259, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980). As Dr. Johnson's privileges were revoked on February 10, 1987, the statute of limitations on civil rights claims arising from that event appears to have expired on February 10, 1990.[4] While Dr. Johnson acknowledges the general rule, he contends that his 1987 civil rights claims are timely because they are part of a continuing violation of the Civil Rights Act.

■■■ Under Title VII of the Civil Rights Act of 1964, the existence of a continuous practice and policy of discrimination delays the commencement of the limitation period until the last discriminatory act in furtherance thereof.[5] *E.g., Cornwell v. Robinson,* 23 F.3d 694, 703 (2d Cir.1994); *Lambert v. Genesee Hospital,* 10 F.3d 46, 53 (2d Cir. 1993); *Gomes v. Avco Corp.,* 964 F.2d 1330, 1333 (2d Cir.1992); *Association Against Discrimination in Employment, Inc. v. Bridgeport,* 647 F.2d 256, 274–75 (2d Cir.1981), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982); *see Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (Fair Housing Act); *Delaware State College,* 449 U.S. 250, 101 S.Ct. 498; *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558–60, 97 S.Ct. 1885, 1889–90, 52 L.Ed.2d 571 (1977). The Second Circuit has applied this Title VII doctrine to claims under 42 U.S.C. §§ 1981 and 1985, albeit without discussion.[6] *Cornwell,* 23 F.3d at 703–04. In consequence, the question is whether Dr. Johnson comes within the continuing violation doctrine.

As one commentator has written, the continuing violation doctrine "continues to be one of the most confusing and inconsistently applied developments in employment discrimination law." Ramona L. Paetzold & Anne M. O'Leary–Kelly, *Continuing Violations and Hostile Environment Sexual Harassment: When Is Enough, Enough?* 31 AM.BUS.L.J. 365, 382 (1993) (hereinafter *When is Enough, Enough?*). To begin with, while most Circuits have held that a continuing violation may be established by proof either of a discriminatory policy or mechanism or of a series of related acts of discrimi-

---

**4.** While Dr. Johnson commenced *Johnson I* three days before the expiration of the statute on the civil rights claims, he did not assert any of those claims in that case.

**5.** This contrasts sharply with the principle applied to continuous courses of wrongful conduct in other areas of the law, where each act in furtherance of the wrongful scheme or pattern begins a new limitations period but does not reach back to render timely claims based on acts outside the statutory limitation period. *E.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 502, 88 S.Ct. 2224, 2236, 20 L.Ed.2d 1231 (1968) (continuing antitrust violation); *Singleton v. City of New York,* 632 F.2d 185 (2d Cir.1980); *Rutkin v. Reinfeld,* 229 F.2d 248 (2d Cir.), *cert. denied sub nom. Kaplow v. Reinfeld,* 352 U.S. 844, 77 S.Ct. 50, 1 L.Ed.2d 60 (1956) (continuing conspiracy); II PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 338(b), at 149 (rev.ed.1995) (continuing antitrust violation).

**6.** There are important differences between Title VII cases and actions based on claims under Sections 1981 and 1985(3) that may warrant different treatment with respect to continuing violations. The limitation period in Title VII cases is 180 to 300 days, recovery of back pay is capped at two years, and compensatory and punitive damages are capped at legislatively determined amounts, even in continuing violation cases. 42 U.S.C. §§ 1981a, 2000e–5(g) (1988 & Supp.1993). The limitation period in Section 1981 and 1985(3) cases is much longer. Even more important, there is no cap on the period for which monetary damages may be awarded. Hence, simple transplantation of the continuing violation doctrine from Title VII to Sections 1981 and 1985(3) may produce unintended consequences. In view of this Court's conclusion that the requirements of the continuing violations doctrine, as it is applied in Title VII cases, are not satisfied here, this issue need not be decided.

nation,[7] the decisions in this Circuit do not necessarily yield that conclusion. In *Lambert*, the Court held that the continuing violation doctrine is limited to "specific discriminatory policies or mechanisms, such as discriminatory seniority lists, ... or discriminatory employment tests ..." 10 F.3d at 52. In *Cornwell*, a different panel wrote that the occurrence of "specific and related instances of discrimination tolerated by an employer over a sufficient period" may be evidence of a continuing violation, apparently viewing protracted employer indifference as a policy or mechanism. 23 F.3d at 704.

Nor are many courts clear as to the criteria that determine when pre-limitation discriminatory acts cross the line from being "unfortunate event[s] in history which ha[ve] no present legal consequences"[8] to being elements in a continuing violation. Perhaps the most specific standard articulated thus far is that adopted by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State University*, 715 F.2d 971 (5th Cir.1983), cert. denied, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986), which held that the determination of whether a continuing violation exists depends principally upon a three-pronged analysis:

"The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly pay check) or more in the nature of an isolated employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness

and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?" 715 F.2d at 981. This analysis, which has been adopted by several circuits,[9] seems to this Court to give appropriate regard to the policies that animate both the civil rights laws and the law governing statutes of limitations.

■■ The *Berry* standard, first of all, presupposes that related acts may come within the continuing violation doctrine even absent a formal discriminatory structural mechanism. This seems correct in light of the Supreme Court's decisions in this area. In *Havens Realty Corp.*, 455 U.S. 363, 102 S.Ct. 1114, for example, the Court upheld the use of the continuing violation theory to reach multiple acts of racial steering. Nor, given *Delaware State College*, may *Havens* be passed over as a case involving a formal discriminatory mechanism. The Court in *Delaware State College* acknowledged the possibility that a continuing violation, in appropriate circumstances, might be established by multiple discriminatory acts directed at an individual. 449 U.S. at 257–58, 101 S.Ct. at 503–04. That brings us to the question addressed by *Berry*, viz. when multiple acts ought be characterized as a continuing violation and thus permit the plaintiff to recover for acts which, if sued upon in isolation, would be time-barred, a question best approached with an appreciation of the underlying problem of discrimination in the workplace.

Discriminatory or allegedly discriminatory behavior in the employment context takes

---

7. *See Purrington v. University of Utah*, 996 F.2d 1025 (10th Cir.1993); *Selan v. Kiley*, 969 F.2d 560 (7th Cir.1992); *Haithcock v. Frank*, 958 F.2d 671 (6th Cir.1992); *Johnson v. Rodriguez*, 943 F.2d 104 (1st Cir.1991); *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472 (9th Cir.1989); *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395 (D.C.Cir. 1988); *EEOC v. Westinghouse Electric Corp.*, 725 F.2d 211 (3d Cir.1984); *Berry v. Board of Supervisors of Louisiana State University*, 715 F.2d 971 (5th Cir.1983) (either a policy or practice or a series of related acts against an individual can form the basis of a continuing violation); *but see Stoller v. Marsh*, 682 F.2d 971, 975 (D.C.Cir.

1982) (suggesting that a policy or practice is required before a continuing violation will be found).

8. *United Air Lines, Inc.*, 431 U.S. at 558, 97 S.Ct. at 1889.

9. *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 n. 9 (3d Cir.1995); *Mascheroni v. Board of Regents of University of California*, 28 F.3d 1554, 1561 (10th Cir.1994); *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1415 (10th Cir. 1993); *Selan v. Kiley*, 969 F.2d 560, 565–66 & n. 7 (7th Cir.1992); *Roberts v. Gadsden Mem. Hosp.*, 835 F.2d 793, 800 (11th Cir.1988).

many forms. Some acts, if taken in isolation, may be ambiguous. The apparent existence of a discriminatory motive or effect may be perceptible only with repetition or over time.

Even unambiguously biased behavior in the workplace is not all alike. Some consists of acts directed at the employee by co-workers, but which reflect no more than the individual prejudices of the actors. Some involves the product of explicit, employer-promulgated policies, practices or mechanisms. There are a myriad of intermediate situations, which may include employer tolerance of employee bias, covert employer-sponsored discrimination and other variations. Nor are these categories neat and mutually exclusive. Rather, they are points along a continuum ranging from no employer involvement through employer awareness to employer tolerance and ultimately employer sponsorship.

The situation of the individual employee, particularly with reference to the prospect of litigation, can vary tremendously depending upon circumstances such as these. The employee at first may not be certain that he or she is confronting discrimination at all. Even where the prejudice is manifest, it may be unclear whether the employer fairly can be taxed with responsibility. And even where the employer is responsible, an employee who seeks to hold on to his or her job may face a difficult choice in deciding whether or not to sue. *See generally When is Enough, Enough?* 31 AM.BUS.L.J. at 377, 393–94.

The first two factors in the *Berry* test—subject matter and frequency—bear on whether acts both within and without the limitation period are part of "a discriminatory policy or practice" chargeable to the employer, *Cornwell,* 23 F.3d at 704, as distinguished from unrelated if deplorable manifestations of individual prejudice. They thus reflect the view that a claim involving an employer's discriminatory policy or practice should not always be cabined by the statutory limitation period in recognition of the special difficulties with which an employee may have to deal.

The third factor—whether the nature of the events outside the limitation period should have triggered awareness of the need to assert one's rights—evokes considerations central to statutes of limitations generally. Moreover, as suggested by the passage from *Berry* quoted above, it generally is regarded as the core and most important element of the *Berry* test. *See Selan,* 969 F.2d at 565–66 & n. 7; *Sabree v. United Brotherhood of Carpenters & Joiners Local No. 33,* 921 F.2d 396, 402 (1st Cir.1990); *Hendrix v. City of Yazoo City,* 911 F.2d 1102, 1104 (5th Cir. 1990); *Glass v. Petro–Tex Chemical Corp.,* 757 F.2d 1554, 1561 n. 5 (5th Cir.1985).

■ Statutes of limitation, of course, are intended to protect against stale claims. *Havens,* 455 U.S. at 380, 102 S.Ct. at 1125. They do so out of a sense that prospective litigants have a right to repose after a legislatively determined period, as well as a concern that the passage of too much time without assertion of a claim may prejudice the ability of the defendant to obtain a fair resolution. *United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979); *Gadsden Memorial Hospital,* 835 F.2d at 800. But they are not without exception, and the limits of the continuing violation doctrine perhaps are best understood in the broader context of the numerous doctrines that ease the rigor with which statutes of limitation are applied.

■ One such ameliorating doctrine is the discovery rule, which holds that certain causes of action, notably fraud, accrue (i.e., the limitation period begins to run) only when the plaintiff knows, or in the exercise of reasonable diligence should know, of the existence of or basis for the claim. *E.g., Woods v. Candela,* 13 F.3d 574 (2d Cir.1994); *Leon v. Murphy,* 988 F.2d 303 (2d Cir.1993); *Gnazzo v. G.D. Searle & Co.,* 973 F.2d 136 (2d Cir.1992) (Connecticut law); 15 U.S.C. § 77m (1988); N.Y. CPLR 203(g) (McKinney 1990 & Supp.1995). Another is the principle that the limitation period is tolled during a defendant's fraudulent concealment of facts that would alert the plaintiff to the plaintiff's claim. *See Cerbone v. International Ladies Garment Workers Union,* 768 F.2d 45, 48 (2d Cir.1985). A defendant may be equitably estopped to assert the statute where the defendant's actions cause the plaintiff to fore-

bear from asserting the plaintiff's rights. *See Hoemke v. New York Blood Center*, 720 F.Supp. 45 (S.D.N.Y.1989); *Barrett v. Hoffman*, 521 F.Supp. 307 (S.D.N.Y.1981); *Simcuski v. Saeli*, 44 N.Y.2d 442, 406 N.Y.S.2d 259, 377 N.E.2d 713 (1978). The limitation period, at least in New York and no doubt elsewhere, is tolled with respect to a malpractice claim against a professional during the course of treatment in which the alleged malpractice occurred. *E.g., McDermott v. Torre*, 56 N.Y.2d 399, 452 N.Y.S.2d 351, 437 N.E.2d 1108 (1982); *Borgia v. City of New York*, 12 N.Y.2d 151, 155, 237 N.Y.S.2d 319, 321, 187 N.E.2d 777, 778 (1962). There are other examples. *See, e.g., Cullen v. Margiotta*, 811 F.2d 698, 721–24 (2d Cir.), *cert. denied, Nassau County Republican Committee v. Cullen*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987) (duress). But they all boil down to a simple proposition: the statutory period of limitation does not run while the plaintiff fails to bring suit as a result of blameless ignorance, culpable action by the defendant, or the continued existence of a close and important relationship that reasonably may be regarded as making the commencement of litigation inappropriate or unduly costly in human terms.

▆▆▆ Against this background, the *Berry* test comes into sharp focus. If the discriminatory acts within and without the limitation period are sufficiently similar and frequent to justify a conclusion that both are part of a single discriminatory practice chargeable to the employer, the continuing violation doctrine permits assertion of claims based on both in recognition of the special problems inherent in the employment context. But the third of the *Berry* factors limits the scope of this otherwise boundless exception to the statute of limitations by permitting suit on a continuing violation the-

ory only if the circumstances are such that a reasonable person in the plaintiff's position would not have sued earlier. *See, e.g., West*, 45 F.3d at 755; *Martin*, 3 F.3d at 1415 n. 6. This proviso gives due regard both to the defendant's interest in being protected against stale claims and to the plaintiff's interest in adopting strategies designed to deal both with employment discrimination and of being certain that matters have reached a point affording a proper basis for resort to the courts. *See generally When is Enough, Enough?* 31 Am Bus. L.J. at 393–94.

In this case, the Court assumes *arguendo* that Dr. Johnson has satisfied the first prong of the *Berry* standard.[10] His case with respect to the second prong is much weaker, as the alleged discriminatory behavior apart from the 1987 and 1994 privileges actions consists of less than a handful of racial epithets allegedly directed at Dr. Johnson over a period of many years. (Turgeon Dec. ¶ 4; Fortuna Affs.) Without in any way condoning incidents of the character alleged, the evidence, taken in the light most favorable to Dr. Johnson, may not establish a pattern of frequent incidents of racial bias. But these issues need not be determined conclusively, as the Court is satisfied that Dr. Johnson has not satisfied the third prong of the *Berry* standard.

When Dr. Johnson's vascular and thoracic surgery privileges were revoked in 1987, he was well aware of the basis for the charges of racial discrimination included in the amended complaint in this action. In proceedings before the hospital's Peer Review and Ethics Committee on February 24, 1987, Dr. Johnson characterized the revocation of his privileges as racially motivated. (Def.Ex. 26, ¶¶ 3–4; Def.Ex. 27, ¶¶ 3–4) He charged in the 1987 State court action that the initial recommendation to terminate those privi-

---

10. The first prong of the *Berry* standard assumes that the act within the period of limitation itself constitutes a violation of the civil rights laws, as it must in light of *Delaware State College's* holding that a mere consequence within the period of an earlier violation is insufficient to trigger the continuing violation doctrine. 449 U.S. at 257–58, 101 S.Ct. at 503–04. The parties therefore have debated whether the 1994 reinstatement application involved, as Dr. Johnson claims, an unprincipled manipulation or, as the hospital claims, a straightforward application of the credentialing process established by the hospital's By–Laws. If it was the former, there may well be a basis for concluding that Dr. Johnson has established a *prima facie* case that the 1994 incident was a violation of the same character alleged with respect to the 1987 decision. If it was the latter, there probably is not. In view of the basis upon which the Court disposes of this motion, it need not determine this issue.

leges was the product of racial prejudice. (Def.Ex. 33, ¶ 13) One of the affidavits on this motion attesting to an alleged instance of racial bias even was submitted in *Johnson I*. (Fortuna Aff., Feb. 5, 1991) Yet for reasons unknown, Dr. Johnson did not make any claims in *Johnson I* under the civil rights laws.

The question when a plaintiff in a discrimination case "has had enough" so as to warrant the commencement of litigation may be subtle and difficult. The Court acknowledges that many employees who seek to hold on to their jobs in the face of a hostile environment face hard choices. Fine lines sometimes must be drawn as to when a level of harassment or prejudice has risen to a level sufficient to charge the victim with knowledge that the victim must assert or lose his or her rights. *See When is Enough, Enough?* 31 AM.BUS.L.J. at 377. Such cases frequently may raise genuine issues as to the applicability of the continuing violation doctrine. But this is not such a case. Here Dr. Johnson brought two lawsuits within three years of the 1987 revocation of his privileges. He made a claim of racial discrimination in the State court case, but not in *Johnson I*. No reason has been advanced as to why the civil rights claims were not asserted in federal court until more than seven years after the privileges were revoked, and the Court can conceive of none. In consequence, the Court holds that the continuing violation doctrine does not apply and that Dr. Johnson's claims under 42 U.S.C. §§ 1981 and 1985(3) with respect to the 1987 revocation of his privileges are barred by the statute of limitations.

*The Tortious Interference Claim*

■ Count V, Dr. Johnson's claim for tortious interference with prospective economic advantage, is based entirely on the assertion that the 1987 revocation of his privileges had a negative effect on contractual relationships that he then had or subsequently had or might have had. (Am Cpt ¶¶ 158–66; Johnson Dec. ¶¶ 152–54) The parties agree that the claim is governed by New York's three year statute of limitations. N.Y. CPLR § 214 (McKinney 1990). Dr. Johnson argues, however, that the claim is not time-barred because he has been injured within the three year limitation period. The argument, however, must be rejected.

A tort claim of this nature accrues, and the limitation period begins to run, under New York law when the last of the elements of the cause of action, typically injury, exists. *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 933–34, 612 N.E.2d 289, 291–92 (1993); *Schmidt v. Merchants Despatch Transportation Co.*, 270 N.Y. 287, 300, 200 N.E. 824 (1936). As the wrongful conduct underlying the claim all occurred in 1987, and as Dr. Johnson alleged a similar tortious interference claim in 1990 in *Johnson I*, he cannot deny that the elements of the cause of action were satisfied at least as early as *Johnson I*. The subsequent injuries alleged are immaterial to the issue of timeliness. *Piracci Construction Co. v. Skidmore, Owings & Merrill*, 490 F.Supp. 314, 321 (S.D.N.Y.), *aff'd*, 646 F.2d 562 (2d Cir.1980) (table); *see Kronos, Inc.*, 81 N.Y.2d at 94–95, 595 N.Y.S.2d at 934, 612 N.E.2d at 292 (claim for interference with contract not barred, although contract breached before limitation period, because injury first sustained within limitation period). The running of the limitation period was not tolled for the reasons stated above. In consequence, this claim is time-barred as well.

*The 1994 Reinstatement Application*

■ Dr. Johnson does not here assert antitrust claims with respect to the 1994 reinstatement application, acknowledging that *Johnson I* requires him resort to the PHC before bringing such an action. Nor does the tortious interference claim rest in any part on the 1994 events. He does contend, however, that the denial of the reinstatement application violated 42 U.S.C. §§ 1981 and 1985(3).

The defendants argue that *Johnson I* requires Dr. Johnson to resort to the PHC before proceeding in federal court. In *Johnson I*, the Second Circuit stated:

"Primary jurisdiction demands that Johnson resort to the PHC before seeking redress in federal court. The question whether defendants had a proper medical reason to terminate Johnson's privileges requires a skilled evaluation of whether Johnson provided inadequate treatment to Nyack's patients. This decision necessitates examination of various medical data concerning Johnson's cases. The medical

expertise of the PHC will prove extremely helpful in sorting through these complex records and resolving the factual questions at stake." 964 F.2d at 122.

Dr. Johnson's response to defendants' primary jurisdiction argument is that the PHC "does not even have jurisdiction to hear a federal civil rights claim." He asserts also that he still must be given an opportunity to prove that any "legitimate" reasons for denial of reinstatement were pretextual. (Pl.Br. 36) He is right on both counts, but that nonetheless does not defeat defendants' argument, given the premises of the Second Circuit's ruling in *Johnson I.*

The PHC has no more jurisdiction over antitrust claims than it does over civil rights claims. Moreover, even a PHC ruling adverse to Dr. Johnson on the 1987 revocation of privileges would not necessarily have foreclosed his antitrust claim, just as an adverse ruling on the 1994 reinstatement issue would not necessarily foreclose his civil rights claims. The Second Circuit nevertheless held that the federal courts were likely to benefit from a PHC review of the medical issues before they considered the antitrust claims. While the PHC's action on Dr. Johnson's complaint with respect to the 1987 events demonstrates that the Court of Appeals' hope for aid from the PHC has not been realized and suggests that further resort to that agency may be fruitless, there is no logical basis for distinguishing the civil rights claims from the antitrust claims. In consequence, bound as it is by the ruling in *Johnson I,* this Court is required to hold that the PHC has primary jurisdiction over Dr. Johnson's Civil Rights Act claims with respect to the 1994 reinstatement application. The Court, however, will retain jurisdiction pending the prompt commencement and diligent prosecution of PHC proceedings.

### Conclusion

Defendants' motion for summary judgment dismissing Counts I, II and V as well as so much of Counts III and IV as seek relief with respect to the 1987 revocation of privileges, is granted. The remaining aspects of Counts III and IV, which seek relief with respect to the 1994 reinstatement application, are stayed pending resort to the PHC. In the event plaintiff does not file an appropriate application in the PHC within thirty days following the date hereof or thereafter fails diligently to prosecute the application, the Court will entertain a motion to dismiss the remaining aspects of this action for want of prosecution. The parties shall file with this Court a joint report as to the status of any PHC proceeding on or before July 28, 1995 and every sixty days thereafter.

The aspects of this case that have been dismissed relate exclusively to the 1987 revocation of privileges and fully dispose of all claims regarding those events. Those that remain pending relate solely to the 1994 reinstatement application. The legal issues decided on this motion are unique to the claims relating to the 1987 events. Appellate review of those issues therefore will involve issues entirely distinct from the aspect of the case not yet disposed of. Accordingly, there is no just reason for delay, and the Clerk is directed to enter judgment pursuant to FED. R.CIV.P. 54(b) dismissing Counts I, II and V and so much of Counts III and IV as relate to the 1987 revocation of privileges.

SO ORDERED.