Nelson S. JENKINS, Plaintiff,

v.

WAL–MART STORES, INC., Defendant.

No. C 93–3069.

United States District Court,
N.D. Iowa,
Central Division.

Nov. 26, 1995.

Craig M. Byram and Gary E. Leonard, Alderson, Ondov, Leonard, Sween & Rizzi, P.A., Austin, Minnesota, for Plaintiff Nelson Jenkins.

Robert S. Kinsey, III, Brown, Kinsey & Funkhouser, Mason City, Iowa, for Defendant Wal–Mart Stores, Inc.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND ....................1406

II. STANDARDS FOR SUMMARY JUDGMENT .............................1407

III. FINDINGS OF FACT.........................................................1409
 A. Undisputed Facts .........................................................1409
 B. Disputed Facts ...........................................................1411

IV. LEGAL ANALYSIS .......................................................1413
 A. Jenkins' Claim As a Continuing Violation .......................1413
 1. "Series of acts" type of continuing violation ...........................1415
 2. "Discriminatory policy or system" as a continuing violation ..............1415
 B. Jenkins' Race Discrimination Claims...................................1417
 1. Disparate treatment .......................................................1417
 a. The analytical framework for a disparate treatment claim ...........1418
 b. The prima facie case ........................................................1420
 c. Legitimate, non-discriminatory reason and pretext ..............1421
 d. Jenkins' disparate treatment claim under Title VII ..................1421
 e. Jenkins' disparate treatment under Iowa Code Ch. 216..............1422
 2. Jenkins' disparate impact claim.......................................1423
 C. Jenkins' Defamation Claim ..............................................1425
 1. Defamation and defamation "per se" .................................1425
 2. Qualified privilege .......................................................1426
 3. Jenkins' defamation claim.............................................1427

V. CONCLUSION ................................................................1427

BENNETT, District Judge.

This litigation involves the issue of whether an employer's repeated denial of promotions throughout seven years of plaintiff's employment and plaintiff's allegedly involuntary termination was a pretextual mask disguising racially discriminatory promotion procedures. Defendant has moved for summary judgment, claiming plaintiff's race discrimination claims are time-barred because any alleged denial of promotions occurred beyond the 180–day limitation period under Title VII and Iowa Code Chapter 216. However, plaintiff alleges defendant's promotion policy created a continuous violation, thus tolling the 180–day limitation period. Failing its procedural defense, defendant asserts the familiar incantation that plaintiff cannot establish a *prima facie* case. Plaintiff, in turn, alleges he can establish a *prima facie* case regarding his race discrimination claims under both disparate impact and disparate treatment theories of race discrimination. Lastly, defendant moves for summary judgment regarding plaintiff's common-law defamation claim on the grounds that any al-legedly defamatory statements were made under a qualified privilege. In response, plaintiff asserts these statements were made with a total lack of good faith and thus, the defense of qualified privilege is inapplicable.

### I. INTRODUCTION AND PROCEDURAL BACKGROUND

On October 15, 1993, plaintiff Nelson Jenkins, an African–American male, filed a complaint in this court, alleging three causes of action against his former employer, defendant Wal–Mart Stores ("Wal–Mart"). In his first cause of action, Jenkins alleges Wal–Mart discriminated against him based on his race, demoting him, failing to promote him, and generally engaging in discriminatory employment practices ultimately resulting in his termination in violation of 42 U.S.C. § 2000e *et seq..* The second count of his complaint states parallel race and age discrimination claims against Wal–Mart pursuant to Iowa Code § 601A.6(1)(a) (now Iowa Code § 216.6(1)(a)), describing the same discriminatory employment practices and consequences. In count three of his complaint,

Jenkins asserts a common-law defamation claim against Wal–Mart, arguing supervisors at Wal–Mart had made and published false statements and innuendo about Jenkins, including statements that Jenkins was a thief and a liar, which harmed his reputation and are defamatory per se. Jenkins seeks damages for back-pay, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life, along with punitive damages, costs, disbursements, and attorney fees. As precursors to this lawsuit, Jenkins filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and received an administrative release from the EEOC on October 1, 1993. In addition, Jenkins filed a complaint with the Iowa Civil Rights Commission ("ICRC") and received an administrative release from the ICRC on September 10, 1993.

Wal–Mart filed an answer to Jenkins' complaint on November 22, 1993, generally denying the allegations contained in all three counts. Also on November 22, 1993, Wal–Mart filed a motion to dismiss and/or motion for judgment on the pleadings as to Count Two of Jenkins' complaint. Count Two referred to a claim for age discrimination; however, Wal–Mart argued Jenkins had failed to exhaust his administrative remedies regarding any age discrimination claims. On December 23, 1994, this court granted Wal–Mart's motion, dismissing Jenkins' state law age discrimination claims found in Count Two of the complaint pursuant to *Fed. R.Civ.P.* 12(b)(1) for lack of subject matter jurisdiction.

On March 13, 1995, Wal–Mart filed a motion to amend its answer, seeking to include two affirmative defenses. In its first affirmative defense, Wal–Mart asserts Jenkins failed to mitigate his damages concerning all three counts in the complaint. Regarding Count Three of the Complaint, Jenkins raised a second affirmative defense, arguing that all communications by Wal–Mart's managerial representatives are not actionable because of a qualified privilege. On March 20, 1995, Jenkins resisted this motion, and Wal–Mart, in turn, responded to Jenkins' resistance on March 27, 1995. However, the parties filed a joint application for order on April 10, 1995, agreeing Wal–Mart's motion to amend its answer should be granted. Subsequently, on April 26, 1995, Chief Magistrate Judge John A. Jarvey granted Wal–Mart's motion to amend its answer.

Wal–Mart filed a motion for summary judgment on July 24, 1995, along with a brief supporting its motion and a statement of material facts not in dispute. On August 7, 1995, Jenkins filed a statements of facts in dispute and memorandum of law, resisting Wal–Mart's motion for summary judgment. Having reviewed the procedural background of this case, the court turns next to the standards for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini*, 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir. 1992).

The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. a party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon. ... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-*

vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(b) & (c) (emphasis added); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); Beyerbach v. Sears, 49 F.3d 1324, 1325 (8th Cir.1995); Munz v. Michael, 28 F.3d 795, 798 (8th Cir.1994); Roth v. U.S.S. Great Lakes Fleet, Inc., 25 F.3d 707, 708 (8th Cir.1994); Cole v. Bone, 993 F.2d 1328, 1331 (8th Cir.1993); Woodsmith Publishing Co. v. Meredith Corp., 904 F.2d 1244, 1247 (8th Cir.1990); Wabun–Inini, 900 F.2d at 1238 (citing Fed.R.Civ.P. 56(c)).[1] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Jenkins, and give him the benefit of all reasonable inferences that can be drawn from the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); Munz v. Michael, 28 F.3d 795, 796 (8th Cir.1994); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir.1994); Johnson v. Group Health Plan, Inc., 994 F.2d 543, 545 (8th Cir.1993); Burk v. Beene, 948 F.2d 489, 492 (8th Cir.1991); Coday v. City of Springfield, 939 F.2d 666, 667 (8th Cir.1991), cert. denied, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

■ Procedurally, the moving party, Wal–Mart, bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." Hartnagel, 953 F.2d at 395 (citing Celotex, 477 U.S. at 323, 106 S.Ct. at 2553); see also Reed v. Woodruff County, Ark., 7 F.3d 808, 810 (8th Cir.1993). Wal–Mart is required by Rule 56 to support its motion with affidavits or other similar materials negating the opponent's claim. Id.

■ "When a moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S.Ct. at 1356. Jenkins is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324, 106 S.Ct. at 2553; McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 511 (8th Cir.1995); Beyerbach, 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" Metge v. Baehler, 762 F.2d 621, 625 (8th Cir.1985) (quoting Impro Products, Inc. v. Herrick, 715 F.2d 1267, 1272 (8th Cir.1983), cert. denied, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), cert. denied sub nom. Metge v. Bankers Trust Co., 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66 (8th Cir.1994).

■ In Anderson, 477 U.S. at 249, 106 S.Ct. at 2510, Celotex, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and Matsushita, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Johnson v. Enron Corp., 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the

---

1. An issue of material fact is genuine if it has a real basis in the record. Hartnagel v. Norman, 953 F.2d 394 (8th Cir.1992) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); Beyerbach, 49 F.3d at 1326; Hartnagel, 953 F.2d at 394.

nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If Jenkins fails to make a sufficient showing of an essential element of a claim with respect to which he has the burden of proof, then Wal–Mart is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for Jenkins, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247.

■ Furthermore, the Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.*, 45 F.3d 262 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate only in those rare instances "where there is no dispute of fact and where there exists only one conclusion." *Webb v. St. Louis Post–Dispatch*, 51 F.3d 147, 148 (8th Cir.1995) (quoting *Johnson*, 931 F.2d at 1244); *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Id.* (holding that there was a genuine issue of material fact precluding summary judgment); *Johnson*, 931 F.2d at 1244. With these standards in mind, the court turns to consideration of the Wal–Mart's motion for summary judgment.

## III. FINDINGS OF FACT

### A. Undisputed Facts

The summary judgment record reveals the following facts are undisputed. Wal–Mart is a corporation which operates in Cerro Gordo County, Iowa,[2] and Jenkins is an African–American male, residing in Cerro Gordo County, Iowa. From April 29, 1985 through December 17, 1992, Wal–Mart employed Jenkins at its store located in Mason City, Iowa. (Complaint ¶ 11.). Jenkins was hired initially as a salesperson in the sporting goods department; however, in late 1986 or early 1987, Jenkins received a promotion and became the manager of the sporting goods department. At the time Jenkins served as sporting goods department manager, Gene O'Brien was the store manager of the Mason City Wal–Mart store. Likewise, during the time period Jenkins held his managerial position, Rusty Johnson was the store assistant manager with direct supervisory responsibilities over Jenkins and had the responsibility of evaluating Jenkins in his capacity as a department manager. On September 16, 1987, Jenkins was demoted from his position as manager of the sporting goods department to his original position as a salesperson. Jenkins continued to work in the sporting goods department until Wal–Mart selected a new sporting goods department manager. Once Wal–Mart named Don Schwartz, a white male, as Jenkins' replacement as department manager, Jenkins was transferred to the receiving department and worked there for six months. After working for six months in the receiving department, Wal–Mart transferred Jenkins back to his job as a salesperson in the sporting goods department.

Schwartz occupied the managerial position in the sporting goods department from 1987 to 1989. Following Schwartz's departure, Wal–Mart promoted Shirley Walswick to the position of sporting goods department manager. Wal–Mart had initially hired Walswick on April 29, 1985, the same day it had hired Jenkins. Walswick served as the department manager from 1989 to 1990, and was

**2.** Wal–Mart is a corporation incorporated under the laws of a state other than Iowa and has its principal place of business in a state other than Iowa.

subsequently replaced by Brian Keefe, who also vacated the position in 1990. Walswick once again served as the interim sporting goods department manager from 1990 to 1992. On April 18, 1992, Walswick had a "decision making day," which is the highest form of reprimand utilized by Wal–Mart prior to a termination. (See Walswick employment file; O'Brien deposition, p. 35.). Regarding the events that resulted in this reprimand, Walswick's employment file revealed Walswick "admitted to doubling her accounts in conjunction with taking only ½ the markdown percentage amount. The markdown therefore resulted in the same M.D. dollar amount being taken, but indicated a smaller percentage. This is a violation of company policy, and any further violation will result in termination." (Walswick employment file.). Furthermore, on January 26, 1993, Walswick received a written reminder, which is an intermediate reprimand one step short of a "decision making day." (Walswick employment file; O'Brien deposition, pp. 28, 35.). In this written reminder, Wal–Mart indicated "Shirley and her spouse spent an overnight social trip with Judy Lien (her assistant [manager]) & spouse and Al & Karen Holm ([assistant managers]). This is a violation of our company policy regarding fraternization and has resulted in other [management] and associates in store questioning favoritism and violation of policies, lowering morale and creating ill feelings and resentment." (Walswick employment file.).

Walswick was replaced by Steve Gabel in the fall of 1992. Steve Gabel began his employment with Wal–Mart on November 21, 1989, working in the receiving department for nine months. After working in the receiving department, Gabel was transferred to the sporting goods department where he worked for six months before Wal–Mart transferred him back to the receiving department. While Gabel was working in the sporting goods department as a salesperson, Gabel received a confidential plan of action regarding his behavior, indicating that Gabel had been partying too much at night, causing him to be tardy for work. (Gabel deposition, p. 14.). Gabel indicated that he would "not party during the week anymore and if [he] did, [he'd] do it without alcohol." (Gabel employment file.). In February 1991, Gabel received a verbal discussion record and a subsequent confidential plan of action regarding Gabel's unexplained absence from the sporting goods counter when he had received instructions not to leave the counter unsupervised. (Gabel employment file.). On January 13, 1992, Gabel received a written reminder for his unexplained absence from work. (Gabel employment file.). Gabel worked for over a year in the receiving department and was subsequently transferred back to the sporting goods department, where he became the department manager. Gabel served as the sporting goods department manager for approximately one year and three months; however, he was demoted from this position due to an "in-stock problem," and transferred to the only available position, which was in the receiving department. (Gabel deposition, pp. 56–57.).

When employees are evaluated, Wal–Mart's policy is to score its employees generally between two and four on a five point scale. While scores of one and five are rare, a score of three is defined as complying with Wal–Mart's requests and is considered a "satisfactory or standard rating." (O'Brien deposition, pp. 50–51.). Jenkins' employment file contains several evaluations scoring Jenkins at a three or higher. (Jenkins' employment file.). On April 30, 1987, Jenkins received a department manager's evaluation ranking him less than satisfactory; however, no written comments regarding Jenkins' work performance were made at that time. (Jenkins' employment file.). However, a sales comparison chart on the back side of this evaluation indicates that sales had increased during his tenure as department manager. (Jenkins' employment file.). Candidates for promotion at Wal–Mart made known their desires to be promoted by informing the assistant manager supervising them of their interest in a promotion.

Between January 1987 and August 1988, Gene O'Brien was the store manager of the Mason City Wal–Mart store. During that time period, Jenkins and possibly one unidentified male were the only non-white employees of the store, which employed approximately 150 employees at the time. (O'Brien deposition, pp. 53–54.). Todd McKee suc-

ceeded O'Brien as the store manager and served as the Mason City store manager for four and one-half years. During that time period, Jenkins and possibly one unidentified female cashier were the only non-white employees of the store. (McKee deposition, p. 22.). As of August 7, 1995, all twenty-two of the department managers of the Mason City Wal–Mart store were white, and since 1989, all department managers at the store had been white. (Wal–Mart's response to Jenkins' interrogatory no. 4.). Also as of August 7, 1995, the Mason City Wal–Mart store employs one African–American employee. (Wal–Mart's response to Jenkins' interrogatory no. 4.).

According to United States Census figures, Cerro Gordo County, Iowa, the county in which Mason City is located, has an overall population which is 3.4% minority. (Lionel Foster affidavit.). Of the unemployed population of Cerro Gordo County, 4.7% are minority. (Foster affidavit.). Of the available civilian labor force, 2.34% of the population of Cerro Gordo County are minority. (Foster affidavit.). From 1989 to 1994, the percentage of non-white employees who were associates of Wal–Mart Stores, Inc., in Iowa, ranged from a six-year low of .89% in 1990 to a high of 1.65% in 1991. (Wal–Mart's supplemental response to Jenkins' interrogatories.).

On December 11, 1992, Devin Cumberland, Mason City Wal–Mart Customer Service Manager, observed Jenkins taking a television set out to the parking lot. On December 17, 1992, representatives from Wal–Mart, including District Loss Prevention Managers Mark Goeman and Don Schmutz, had conversations with Jenkins regarding the alleged theft of a television set from the store. In these conversations, the representatives interrogated Jenkins regarding his possible involvement with this alleged theft. Jenkins left his employment with Wal–Mart on December 17, 1992, and was replaced by Jeff VanWinkel, a male Caucasian. (Complaint ¶ 20.). Subsequently, Jenkins filed a discrimination complaint with the EEOC and the ICRC on January 22, 1993. The body of the discrimination complaint states in pertinent part:

> COMES NOW Nelson Jenkins, a forty-six (46) year old african-american male, (hereafter "Complainant") who worked for Wal–

Mart Discount Cities, (hereafter "Respondent") from April 29, 1985 to December 17, 1992, and pro se files the following charge of race discrimination in employment.

### B. Disputed Facts

The following facts are among those disputed by the parties. Wal–Mart claims Jenkins was demoted from his position as sporting goods department manager because of his incompetent supervisory skills. Jenkins disputes this allegation, arguing he was demoted based on reasons given by Rusty Johnson, the store assistant manager with direct supervisory responsibilities over Jenkins during the time Jenkins was department manager. Jenkins claims that the reasons Johnson presented to O'Brien, the store manager, were false. Jenkins further claims Johnson himself was responsible for some of the deficiencies cited by Johnson and attributed to Jenkins.

Wal–Mart also claims that Jenkins was not more qualified than his replacements in the position of sporting goods department manager. However, Jenkins argues his replacements were clearly not as qualified as he was for the managerial position. Jenkins claims that Walswick, who twice served as the interim sporting goods manager, received the two highest forms of available reprimands from Wal–Mart, short of a termination. Also, Jenkins alleges Wal–Mart determined Keefe could not handle the department manager job on his own and requested that Jenkins complete the scheduling and run the sporting goods department, while Keefe continued to perform his ordering responsibilities. Jenkins claims that after he performed a large portion of Keefe's duties as department manager without a pay increase for two weeks, the sporting goods department once again was in good shape and the full managerial responsibilities were subsequently turned over again to Keefe. In addition, Jenkins alleges store management requested that he train Gabel on the procedure of filling in the gun logs in the sporting goods department. Gabel admits Jenkins taught him the correct gun book procedures. (Gabel deposition, p. 19.). Gabel also acknowledged in his deposition that Jenkins knew more than most of

the other sporting goods employees about the sporting goods department. (Gabel deposition, p. 45.). Furthermore, regarding Gabel's own qualifications, Jenkins alleges Gabel was fired due to his inability to cure the in-stock problem in the sporting goods department. Furthermore, Jenkins claims that before Gabel was chosen for the managerial position, Gabel received a confidential plan of action from management regarding partying too much and being tardy to work and a written reminder for unexplained absence from work. (Gabel deposition, p. 7; Gabel employment file.). Jenkins further notes that one of the justifications Johnson gave when requesting Jenkins' demotion was the existence of errors in the gun logs. Jenkins claims the errors in the gun logs were incorrectly entered by Johnson, and Jenkins did what he could to remedy the errors.

Wal–Mart claims that Jenkins never sought promotions to the position of sporting goods department manager after he was demoted. Jenkins refutes this claim, arguing he followed store policy by informing the assistant manager who had supervisory responsibility over him of his desire to be promoted.

Furthermore, Jenkins alleges he was treated differently than other employees. As an example, Jenkins claims that another white salesperson in the sporting goods department, Bob Luther, presented the same or very similar ideas to management that Jenkins had previously presented to management. Whereas Jenkins claims he received consistently negative responses regarding his ideas, he alleges Luther received positive responses and praise regarding the same ideas. In addition, Jenkins claims store management gave him awards in private rather than at meetings where other employees were given awards. (Jenkins deposition, p. 107.).

■ While Wal–Mart claims that Jenkins' termination was a voluntary termination, Jenkins argues his departure from Wal–Mart was not voluntary. Rather, Jenkins points to the administrative law judge's ("ALJ") decision in his state job service unemployment determination, in which the ALJ found that Jenkins was "in a Catch 22 situation with the employer." (ALJ decision, dated April 12, 1993.). The ALJ indicated that Jenkins denied knowledge of Wal–Mart's accusations regarding the theft of a television set and had offered to take a lie detector test. Also, the ALJ noted that Jenkins requested to see the security video tapes, which loss prevention failed to provide. Rather, the loss prevention managers repeatedly told Jenkins they did not believe him. The ALJ concluded that the "only statement sought by the loss prevention managers from the claimant was one of guilt." (ALJ decision.). The ALJ held that such an assumption of guilt and such a refusal to listen to Jenkins' statement "constitute[d] a threat to the claimant to quit or be discharged." (ALJ decision.).[3]

Also, Jenkins refutes Wal–Mart's allegations regarding the legitimacy of the theft charges lodged against him. Jenkins argues the entire theft investigation was based on statements made by Devin Cumberland, a customer service manager. Cumberland observed Jenkins leaving the store with a television set on a handcart without showing the security tape which was required by store policy. However, Cumberland also testified in his deposition that the sporting goods department was located next to layaway, and it was conceivable that Jenkins could have been taking the television set outside at the

---

3. Although the ALJ's determinations in the unemployment hearing are relevant in weighing the disputed facts of this case, the ALJ's decision does not have preclusive effect on the disposition of Jenkins' discrimination claim. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112–13, 111 S.Ct. 2166, 2171–72, 115 L.Ed.2d 96 (1991) (judicially unreviewed findings of a state administrative agency with respect to an age discrimination claim have no preclusive effect on federal proceedings); *University of Tennessee v. Elliott*, 478 U.S. 788, 796, 106 S.Ct. 3220, 3225, 92 L.Ed.2d 635 (1986) (Congress did not intend

unreviewed state administrative proceedings to have preclusive effect on Title VII claims); *Roth v. Koppers Indus.*, 993 F.2d 1058, 1062 (3d Cir. 1993) (unreviewed findings of state unemployment compensation review board are not entitled to preclusive effect in subsequent employment discrimination actions under Title VII); *Williams v. City of Sioux Falls*, 846 F.2d 509, 513 n. 4 (8th Cir.1988) (determination of discrimination made by administrative agencies in nonadversarial proceedings were relevant to the issue of whether discrimination occurred but did not have preclusive effect).

request of a customer. (Cumberland deposition, p. 25.). Cumberland also noted there was at least one other employee working at the customer service desk to whom Jenkins could have shown the security tape. (Cumberland deposition, pp. 71–72.). Furthermore, Cumberland indicated there was no box or cardboard material found in the store parking lot as claimed by other personnel. (Cumberland deposition, p. 34.). Also, Jenkins notes the loss prevention department never discovered any records indicating that a television of any size or brand was missing from the store's inventory. (Goeman deposition, pp. 74–75.). Based on Cumberland's statements, as well as the admissions of investigators from the loss prevention department, Jenkins disputes the legitimacy of Wal–Mart's allegations. The court will weigh the materiality of these disputed facts in reaching its decision regarding Wal–Mart's motion for summary judgment.

## IV. LEGAL ANALYSIS

In its motion, Wal–Mart claims both Jenkins' federal and state law claims are time-barred because any allegedly discriminatory actions in failing to promote Jenkins . occurred before the 180–day limitations period under both Title VII[4] and Iowa Code ·Ch. 216.[5] Jenkins counters with the assertion that his claims are not time barred in that they are part of a continuing violation, evidenced by Wal–Mart's allegedly racially discriminatory promotion procedures in the workplace. In the event that Jenkins' claims are not time-barred, Wal–Mart argues Jenkins has failed to establish a *prima facie* case of race discrimination under a disparate treatment theory. Jenkins asserts he has raised material fact questions regarding a *prima facie* case of race discrimination under either a disparate treatment theory or a disparate impact theory. In addition, Jenkins claims there are material fact questions indi-

cating that, pursuant to a disparate treatment theory, Wal–Mart's employment actions are a pretext for race discrimination. Lastly, regarding Jenkins' common-law defamation claim, Wal–Mart argues any allegedly defamatory statements made against Jenkins were made by management, and therefore, were made pursuant to a qualified privilege. Furthermore, Wal–Mart claims Jenkins cannot prove the existence of actual malice to destroy this qualified privilege, and consequently, Wal–Mart should be entitled to summary judgment. With both Jenkins' and Wal–Mart's general assertions in mind, the court turns to evaluating each issue on the merits.

### A. Jenkins' Claim As a . Continuing Violation

 A plaintiff making a claim of discrimination may challenge incidents which happened outside the statutory time limitations of Title VII if the various incidents or acts of discrimination constitute a continuing pattern of discrimination. *Delaware State College v. Ricks,* 449 U.S. 250, 258, 101 S.Ct. 498, 504, 66 L.Ed.2d 431 (1980); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558–60, 97 S.Ct. 1885, 1888–90, 52 L.Ed.2d 571 (1977); *Ashley v. Boyle's Famous Corned Beef Co.,* 66 F.3d 164, 167–68 (8th Cir.1995) (citing *Hukkanen v. Internat'l Union of Operating Eng'rs,* 3 F.3d 281, 285 (8th Cir.1993)); *West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995) (a continuing violation can be shown if a specific incident occurred beyond the 180 day period if the incident is part of an ongoing pattern of discrimination); *Chaffin v. Rheem Mfg. Co.,* 904 F.2d 1269, 1271 (8th Cir.1990); *Satz v. ITT Fin. Corp.,* 619 F.2d 738, 743 (8th Cir.1980); *Smith v. Office of Economic Opportunity,* 538 F.2d 226, 228– 29 (8th Cir.1976); *Clark v. Commonwealth Of Pennsylvania,* 885 F.Supp. 694, 706

---

4. The limitation period for Title VII claims, as provided in 42 U.S.C. § 2000e–5(e)(1), states

 [a] charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter. . . .

 42 U.S.C. § 2000e–5(e)(1).

5. The limitation period for state law discrimination claims, as provided in Iowa Code § 216.15(12), states

 [a] claim under [Chapter 216] shall not be maintained unless a complaint is filed with the commission within one hundred eighty days after the alleged discriminatory or unfair practice occurred.

 Iowa Code § 216.15(12).

(E.D.Pa.1995) (quoting *Martin v. Nannie and the Newborns,* 3 F.3d 1410, 1415 (10th Cir.1993), *aff'd,* 54 F.3d 788 (10th Cir.1995), in turn, quoting *Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1543 (10th Cir. 1987)). Under the continuing violation theory there must be at least one instance of discrimination within the filing period, and the earlier acts must be part of continuing policy or practice that includes acts within the filing period. *Gardner v. Morris,* 752 F.2d 1271, 1279 (8th Cir.1985); *West,* 45 F.3d at 754; *Martin,* 3 F.3d at 1415; *Sabree v. United Bhd. of Carpenters and Joiners Local No. 33,* 921 F.2d 396, 400 (1st Cir.1990). Once a plaintiff complains a continuing violation has been ongoing, the plaintiff must file an administrative complaint with the EEOC within the statutory time period from the last discriminatory event. *Hukkanen,* 3 F.3d at 285; *Gardner,* 752 F.2d at 1279 (citing *Milton v. Weinburger,* 645 F.2d 1070, 1075 n. 14 (D.C.Cir.1981) (citation omitted)); *Scott v. St. Paul Postal Serv.,* 720 F.2d 524, 525 (8th Cir.1983), *cert. denied,* 465 U.S. 1083, 104 S.Ct. 1453, 79 L.Ed.2d 770 (1984) (citing *Allen v. Amalgamated Transit Union Local 788,* 554 F.2d 876, 880 (8th Cir.), *cert. denied,* 434 U.S. 891, 98 S.Ct. 266, 54 L.Ed.2d 176 (1977)); *Clark,* 885 F.Supp. at 706; *Miller v. Aluminum Co. of America,* 679 F.Supp. 495, 499 (W.D.Pa.), *aff'd,* 856 F.2d 184 (3d Cir. 1988); *Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512, 527 (Iowa 1990) [6].

▬▬ A plaintiff may not assert a continuing violation based on past isolated instances of discrimination, even where the effects persevere into the present. *Delaware State College,* 449 U.S. at 258, 101 S.Ct. at 504; *Chaffin,* 904 F.2d at 1271–72; *Heymann v. Tetra Plastics Corp.,* 640 F.2d 115, 120 (8th Cir.1981). Therefore, for Jenkins to succeed under the continuing violation theory, he must show more than the occurrence of isolated or sporadic acts of discrimination. *Miller v. Beneficial Management Corp.,* 977

F.2d 834, 844 (3d Cir.1992); *Bruno v. Western Elec. Co.,* 829 F.2d 957, 961 (10th Cir. 1987) (the relevant distinction regarding a continuing violation is the existence of a dogged pattern of discrimination, as opposed to isolated incidents); *Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1544 (10th Cir. 1987); *Jewett v. Internat'l Tel. & Tel. Corp.,* 653 F.2d 89 (3d Cir.), *cert. denied,* 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981); *Satz,* 619 F.2d at 743; *Madden v. Runyon,* 899 F.Supp. 217 (E.D.Pa.1995).

As one commentator has recognized, the continuing violation doctrine "continues to be one of the most confusing and inconsistently applied developments in employment discrimination law." *Johnson v. Nyack Hosp.,* 891 F.Supp. 155, 162 (S.D.N.Y.1995) (citing Ramona L. Paetzold & Anne M. O'Leary-Kelly, *Continuing Violations and Hostile Environment Sexual Harassment: When Is Enough, Enough?,* 31 Am.Bus.L.J. 365, 382 (1993). However, despite this confusion, federal courts appear to consistently acknowledge two types of continuing violations. *Purrington v. University of Utah,* 996 F.2d 1025 (10th Cir.1993); *Selan v. Kiley,* 969 F.2d 560, 565–66 (7th Cir.1992); *Haithcock v. Frank,* 958 F.2d 671 (6th Cir.1992); *Johnson v. Rodriguez,* 943 F.2d 104 (1st Cir.1991), *cert. denied,* 502 U.S. 1063, 112 S.Ct. 948, 117 L.Ed.2d 117 (1992); *Green v. Los Angeles County Superintendent of Sch.,* 883 F.2d 1472, 1480 (9th Cir.1989); *Bruno,* 829 F.2d at 961; *Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971, 981 (5th Cir.1983); *Perez v. Laredo Junior College,* 706 F.2d 731, 735 (5th Cir.1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984); *Stewart v. CPC Internat'l, Inc.,* 679 F.2d 117, 120–21 (7th Cir.1982); *Milton v. Weinberger,* 645 F.2d 1070, 1075–77 (D.D.C. 1981); *Caudill v. Farmland Indus.,* 698 F.Supp. 1476, 1482 (W.D.Mo.1988), *aff'd,* 919 F.2d 83 (8th Cir.1990); *but see Stoller v. Marsh,* 682 F.2d 971, 975 (D.C.Cir.1982),

---

**6.** In *Hy–Vee Food Stores,* the Iowa Supreme Court cited its decision in *Annear v. State,* 419 N.W.2d 377, 379 (Iowa 1988), for the proposition that Iowa Code chapter [216] is patterned after Title VII. Iowa Code chapter 216 contains a 180–day limitation period after the alleged discriminatory or unfair practice happens in which to file a discrimination complaint. *See* Iowa Code § 216.15(12). The court noted that a similar 180–day limitation can be found in the statutory provision, 42 U.S.C. § 2000e–5(e). Based on this similarity, the court considered federal cases on the "continuing violation" doctrine instructive. *Hy–Vee Food Stores,* 453 N.W.2d at 527 (citing *Annear,* 419 N.W.2d at 379).

*cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 787 (1983) (a policy or practice may be required before a continuing violation will be found).[7] The first type is comprised of "a series of acts with one independent discriminatory act occurring within the charge-filing period." *West,* 45 F.3d at 754 n. 9; *Mascheroni v. Board of Regents of Univ. of Cal.,* 28 F.3d 1554, 1561 (10th Cir.1994); *Martin,* 3 F.3d at 1415; *Purrington,* 996 F.2d at 1028; *Selan,* 969 F.2d at 565–66 & n. 7; *Johnson,* 943 F.2d at 108; *Green,* 883 F.2d at 1480; *Bruno,* 829 F.2d at 961; *Berry,* 715 F.2d at 981; *Perez,* 706 F.2d at 735; *Stewart,* 679 F.2d at 120–21; *Milton v. Weinberger,* 645 F.2d at 1075; *Caudill,* 698 F.Supp. at 1482. The second type of continuing violation focuses on the maintenance of a system or policy which discriminates. *Purrington,* 996 F.2d at 1028; *Miller,* 977 F.2d at 844 ("The preponderance of the evidence must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's 'standard operating procedure.' "); *Selan,* 969 F.2d at 565–66 & n. 7; *Johnson,* 943 F.2d at 108; *Green,* 883 F.2d at 1480; *Bruno,* 829 F.2d at 961; *Berry,* 715 F.2d at 981; *Perez,* 706 F.2d at 735; *Stewart,* 679 F.2d at 120–21; *Milton,* 645 F.2d at 1075; *Caudill,* 698 F.Supp. at 1482.

### 1. "Series of acts" type of continuing violation

In analyzing the "series of acts" type of continuing violation, and specifically, the degree of relatedness of such acts, other federal circuits deciding cases of continuing violations have looked towards the following factors adopted by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971 (5th Cir.1983), namely, i) subject matter-whether the violations constitute the same type of discrimination; ii) frequency-whether the alleged acts are of a recurring nature or more in the

nature of an isolated employment decision; and iii) permanence-whether the nature of the violations should trigger an employee's awareness of the need to assert his rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. *West,* 45 F.3d at 754 n. 9; *Mascheroni,* 28 F.3d at 1561; *Martin,* 3 F.3d at 1415; *Selan,* 969 F.2d at 565–66 & n. 7; *Roberts v. Gadsden Memorial Hosp.,* 835 F.2d 793, 800; *Berry,* 715 F.2d at 981; *Oswald v. Laroche Chem.,* 894 F.Supp. 988, 992 (E.D.La.1995); *Egan v. Palos Community Hosp.,* 889 F.Supp. 331, 335–36 (N.D.Ill.1995); *Johnson,* 891 F.Supp. at 163–64; *Clark,* 885 F.Supp. at 706 (citing *Martin,* 3 F.3d at 1415, in turn, citing *Berry,* 715 F.2d 971, 981 (5th Cir. 1983)); *Martin v. Frank,* 788 F.Supp. 821, 828 (D.Del.1992); *Caudill,* 698 F.Supp. at 1482 (citing *Berry* ); *Sessom v. Milwaukee Distribution Ctr. Inc.,* 645 F.Supp. 202, 204–05 (N.D.Miss.1986); *Santos v. Rush–Presbyterian–St. Luke's Medical Ctr.,* 641 F.Supp. 353, 358 (N.D.Ill.1986). These factors take into consideration the policies of both civil rights laws and the law governing statutes of limitations. *See generally Johnson,* 891 F.Supp. at 163–64.

### 2. "Discriminatory policy or system" as a continuing violation

A systematic policy of discrimination is actionable as a continuing violation "even if some or all of the events evidencing its inception occurred prior to the limitations period." *Green,* 883 F.2d at 1480 (citing *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 924 (9th Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982)); *see also EEOC v. Local 350, Plumbers & Pipefitters,* 998 F.2d 641, 643 (9th Cir.1992); *Grimes v. City & County of San Francisco,* 951 F.2d 236, 238 (9th Cir.1991); *Sosa v. Hiraoka,* 920 F.2d 1451, 1455 (9th Cir.1990); *Pike v. City of Mission, Kansas,* 731 F.2d 655, 660 (10th

---

7. Although most federal courts have endorsed the "two types of continuing violations," the Second Circuit has not drawn a similar conclusion in two recent decisions. In *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993), *cert. denied,* 114 S.Ct. 1612, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994), the court limited the continuing violation doctrine to "specific discriminatory policies or mechanisms, such as discriminatory seniority lists, ... or discriminatory employment tests...." *Id.* at 52. Furthermore, in *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994), the court apparently found that employer indifference qualifies as a policy or mechanism, holding the occurrence of "specific and related instances of discrimination tolerated by an employer over a sufficient period" may be evidence of a continuing violation. *Id.*

Cir.1984); *Serpe v. Four–Phase Sys., Inc.,* 718 F.2d 935, 937–38 (9th Cir.1983); *Jewett,* 653 F.2d at 91; *Keenan v. Allan,* 889 F.Supp. 1320, 1371 n. 47 (E.D.Wash.1995); *Gomez v. Amoco Oil Co.,* 767 F.Supp. 191, 196 (N.D.Ind.1991). The rationale behind this conclusion is that the continuing system of discrimination works against an employee and violates that employee's rights continuously and eventually up to a day that falls within the applicable limitations period. *Williams v. Owens–Illinois, Inc.,* 665 F.2d 918, 924 (9th Cir.1982) (citing *Higgins v. Oklahoma ex rel. Oklahoma Employment Sec. Comm'n,* 642 F.2d 1199, 1200 n. 2 (10th Cir.1981)); *Clark v. Olinkraft, Inc.,* 556 F.2d 1219, 1221–22 (5th Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1251, 55 L.Ed.2d 772 (1978).

■ Under this theory, the employee's complaint focuses on the employer's allegedly discriminatory system, as opposed to its application to the employee personally. Consequently, an employee may attack the employer's discriminatory policy even though the employee was not denied a particular job or employment benefit within the limitations period. *Reed v. Lockheed Aircraft Corp.,* 613 F.2d 757, 759–61 (9th Cir.1980); *accord Roberts v. North American Rockwell Corp.,* 650 F.2d 823, 828 (6th Cir.1981) (hiring system would not consider women); *Jewett,* 653 F.2d at 91; *Stallings v. Container Corp. of America,* 75 F.R.D. 511 (D.Del.1977) (plaintiff may challenge promotion procedures even if he cannot show he was rejected during the statutory period). Specifically, regarding a failure to promote, some courts have found that "[a]n employer's terminating an employee, unlike the employer's failure to hire or promote, is a completed act; that its consequences linger does not indicate that the discrimination itself is continuing." *Caldwell v. National Assn. of Home Builders,* 771 F.2d 1051, 1055 (7th Cir.1985); *see also Roberts,* 650 F.2d at 826 (distinguishing between discharge and failure to hire).

Jenkins has argued the specific instances or denials of promotions are not the basis of his charge of discrimination. Rather, Jenkins asserts these denials of promotions evidence a "policy of discrimination [that] pervaded [Wal–Mart]'s personnel decisions." (Jenkins' Memorandum of Law in Opposition to Wal–Mart's Mot. for S.J., p. 19.). Furthermore, Jenkins claims that because of Wal–Mart's discriminatory system, "the violations of which [Jenkins] complains occurred each day of [Jenkins'] employment, including the days within the appropriate limitations period. (Jenkins' Memo. of Law, p. 19.). Wal–Mart has not addressed Jenkins' arguments regarding an alleged "discriminatory policy," but rather has focused its arguments on the fact that the alleged denials of promotions occurred outside of the limitations period, and although Jenkins' termination occurred within the limitations period, Wal–Mart argues this termination was voluntary.

As proof of this discriminatory policy as a continuous violation, Jenkins cites various examples of statistics including Wal–Mart's percentages of Caucasian and African–American employees in the Mason City store, as compared with the available employees in the civilian labor force in Cerro Gordo County. Specifically, Jenkins asserts that from 1989 to 1994, Wal–Mart employed an average of 722 associates at the department level in Iowa. Of those employees, an average of 1.31% were non-white employees. Furthermore, this percentage ranged from a six-year low of .89% in 1990 to a high of 1.65% in 1991. Of the available civilian labor force in Cerro Gordo County, 2.34% of the population are minority.

At the Mason City store, during O'Brien's tenure as store manager from January 1987 to August 1988, Jenkins and possibly one unidentified male were the only non-white employees of the store, which employed 150 employees at the time. McKee succeeded O'Brien as store manager, and during his tenure as store manager for four and one-half years, Jenkins and possibly one unidentified female were the only non-white employees of the store. As of August 7, 1995, the store employed one African–American employee, and all twenty-two of the department managers were white. Furthermore, from 1989 to August 7, 1995, all department managers at the store had been white. In order to be considered for a promotion, employees made their desire to be promoted known by informing the assistant manager supervising them. The assistant manager then can de-

cide whether or not to forward that information along to the store manager. The final decision is based on a subjective evaluation of the employees' performance in their current position, along with other ambiguous criteria. This evaluation process is done primarily by the immediate supervisor, who then discusses his or her findings with the store manager.

Under Wal–Mart's promotion procedure, the one or two African–American employees at any given time would have to relay their desires to be promoted to a predominately, and after 1989, an all-white supervisory staff. Consequently, the minority employees would also be forced to rely on the white supervisors using unspecified criteria to fairly consider them for promotions within Wal–Mart. This type of subjective evaluation procedure and ambiguous criteria create the potential for a disparate impact and discriminatory results in the workplace. Jenkins alleges he was consistently passed over for promotions. Others who succeeded him were white employees, two of whom had experienced confidential plans of action regarding their deficiencies in the workplace. Furthermore, Jenkins alleges at least one promotion was denied and that he was constructively discharged within the 180–day time period prior to the filing of his EEOC complaint. Based on the statistical evidence Jenkins has proffered regarding the composition of the staff and the managerial staff in particular, and the allegation that the promotion procedures continuously served to deny Jenkins advancement within the store, including within the 180–day limitation period, The court finds Jenkins has raised a material fact question regarding the existence of a continuous violation and as such, his claims under Title VII and Iowa Code Ch. 216 are not time-barred. Having reached this conclusion, the court turns to the merits of Jenkins' race discrimination claims.

### B. Jenkins' Race Discrimination Claims

Jenkins has argued Wal–Mart discriminated against him because of his race in violation of 42 U.S.C. § 2000e *et seq.* The United States Supreme Court recognizes two theories to prove employment discrimination under Title VII of the Civil Rights Act of 1991. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396

(1977). One is the disparate treatment theory, and the other is the disparate impact theory. *Id.* Because Jenkins has addressed both theories, the court will examine both of these theories in relation to Jenkins' race discrimination claim.

■ The United States Supreme Court defined these two theories in *International Bhd. of Teamsters v. United States:*

> "Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. . . .

> Claims of disparate treatment may be distinguished from claims that stress "disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. Either theory may, of course, be applied to a particular set of facts.

431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15 (1977) (citations omitted). In summary, the disparate treatment theory focuses on the employer's motivation; the disparate impact theory focuses on the consequences of the employer's conduct. *Id.; compare, e.g. McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973), with *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–32, 91 S.Ct. 849, 853–55, 28 L.Ed.2d 158 (1971).

### 1. Disparate treatment

■ The typical fashion for establishing a *prima facie* case of disparate treatment under Title VII is to apply the burden-shifting analysis found in *McDonnell Douglas* and its progeny. *See, e.g., Wileman v. Frank,* 979 F.2d 30, 33 (4th Cir.1992) (applying this analysis to disparate treatment claims under Title VII generally); *Donoghue v. Orange County,* 828 F.2d 1432, 1439 (9th Cir.1987)

(*McDonnell Douglas* analysis applicable to all disparate treatment claims under Title VII), *as superseded and amended,* 848 F.2d 926, 932 (9th Cir.1987). Analysis of a claim of disparate treatment on the basis of race under Iowa law is analyzed in the same fashion. *See Iowa Civil Rights Comm'n v. Woodbury County Community Action Agency,* 304 N.W.2d 443, 448 (Iowa App.1981).

■■■■ The activities Jenkins asserts have been violated here involve Wal–Mart's failure to promote him on several occasions and the ultimate termination of his employment. Jenkins asserts that he was subjected to disparate treatment on the basis of race in the course of his employment leading to Wal–Mart's failure to promote him and his constructive discharge. A constructive discharge exists when an employer deliberately renders the employee's working conditions intolerable and thus forces the employee to quit. *Bradford v. Norfolk Southern Corp.,* 54 F.3d 1412, 1420 (8th Cir.1995) (citing the *"Bunny Bread"* standards for this kind of claim found in *Johnson v. Bunny Bread Co.,* 646 F.2d 1250 (8th Cir.1981)); *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 497 (8th Cir.1995) (citing the *Bunny Bread* standards); *Smith v. World Ins. Co.,* 38 F.3d 1456, 1460 (8th Cir.1994) (citing *Bunny Bread*); *Hukkanen v. Int'l Union of Operating Eng'rs, Hoisting & Portable Local No. 101,* 3 F.3d 281, 284 (8th Cir.1993) (citing *Bunny Bread*); *Smith v. Cleburne County Hosp.,* 870 F.2d 1375, 1381 (8th Cir.), *cert. denied,* 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 100 (1989); *Southside Public Schools v. Hill,* 827 F.2d 270, 274 (8th Cir. 1987). First, the conditions created by the employer must be such that a reasonable person would find them intolerable. *Bradford,* 54 F.3d at 1420; *Smith,* 38 F.3d at 1460; *Hukkanen,* 3 F.3d at 284; *Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1217 (8th Cir.1985), *cert. denied,* 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *Bunny Bread,* 646 F.2d at 1256 (8th Cir.1981). Second, the employer's actions must have been taken with the intention of forcing the employee to quit. *Smith,* 38 F.3d at 1461; *Hukkanen,* 3 F.3d at 284; *Bunny Bread Co.,* 646 F.2d at 1256. If there is no evidence that the defendant took actions with an intent to force the plaintiff to quit, even if conditions were intolerable, plaintiff's claim fails. *Craft,* 766 F.2d at 1217.

■■■■ The standards in *Bunny Bread* do not mean constructive discharge plaintiffs must prove their employers consciously meant to force them to quit. *Hukkanen,* 3 F.3d at 284. But, when an employer denies a conscious effort to force an employee to resign, the employer must necessarily be held to intend the reasonable foreseeable consequences of its actions. *Kriss v. Sprint Communications Co., Ltd. Partnership,* 58 F.3d 1276, 1283 (8th Cir.1995); *Smith,* 38 F.3d at 1461; *Hukkanen,* 3 F.3d at 284–85. Constructive discharge plaintiffs may therefore satisfy *Bunny Bread*'s intent requirement by showing their resignation was a reasonably foreseeable consequence of their employers' discriminatory actions. *Hukkanen,* 3 F.3d at 284–85. However, where an employer has attempted to accommodate an employee, the employer has been held not to have constructively discharged the employee. *Cleburne County Hosp.,* 870 F.2d at 1380–81.

### a. The analytical framework for a disparate treatment claim

Jenkins has presented only indirect evidence in support of his claim of race discrimination. It is axiomatic that employment discrimination need not be proved by direct evidence, and indeed, that doing so is often impossible, because as the Supreme Court has said, "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." *Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1108 (8th Cir.) (citing *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). In employment discrimination cases based on circumstantial evidence, courts apply the analytical framework of shifting burdens developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and most recently in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125

L.Ed.2d 407 (1993). *Gaworski,* 17 F.3d at 1108.

Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle him to prevail unless contradicted and overcome by evidence produced by the defendant. *White v. McDonnell Douglas Corp.,* 985 F.2d 434, 435 (8th Cir.1993). To establish a *prima facie* case of discrimination under Title VII, the plaintiff must show that the defendant terminated the plaintiff under circumstances which give rise to an inference of unlawful discrimination. *Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 945 (8th Cir.1994) (Title VII race discrimination case); *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1242 (8th Cir.1991) (Title VII discriminatory discharge case).

If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *White,* 985 F.2d at 435. The employer's explanation of its actions must be "clear and reasonably specific," *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096, but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone,* 24 F.3d 1330, 1334 (11th Cir.1994) (citing *Meeks v. Computer Assocs. Internat'l,* 15 F.3d 1013, 1019 (11th Cir.1994)). If the employer meets this burden of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's,* at ——, 113 S.Ct. at 2749.

The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against the plaintiff. *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482; *White,* 985 F.2d at 436; *United States v. Johnson,* 28 F.3d 1487, 1494 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *Johnson,*

931 F.2d at 1242; *Brooks v. Monroe Sys. For Business,* 873 F.2d 202, 204 (8th Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1408 (8th Cir.1987). However, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's,* at ——, 113 S.Ct. at 2749 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 971 (8th Cir.1994) (quoting *St. Mary's*); *EEOC v. Cherry–Burrell Corp.,* 35 F.3d 356, 361 (8th Cir.1994) (quoting *St. Mary's*); *Gaworski,* 17 F.3d at 1109 (quoting *St. Mary's*); *Hicks v. St. Mary's Honor Ctr.,* 2 F.3d 265, 266 (8th Cir.1994) (quoting *St. Mary's,* at ——, 113 S.Ct. at 2749); *Brooks,* 873 F.2d at 204 (submission by the employer of a discredited reason for discharging or failing to promote a person is itself evidence of discriminatory motive).

In two recent decisions, the Eighth Circuit Court of Appeals has considered in more detail the plaintiff's burden to show discriminatory intent when the employer has offered a legitimate, non-discriminatory reason for its actions. *See Lidge–Myrtil v. Deere & Co.,* 49 F.3d 1308 (8th Cir.1995); *Krenik v. County of Le Sueur,* 47 F.3d 953 (8th Cir. 1995). In *Krenik,* the court held that

> [t]o survive summary judgment at the third stage of the *McDonnell Douglas* analysis, a plaintiff must demonstrate the existence of evidence of some additional facts that would allow a jury to find that the defendant's proffered reason is pretext and that the real reason for its action was intentional discrimination. *St. Mary's Honor Ctr.,* at ——, 113 S.Ct. at 2747. These additional facts may be limited solely to proof of pretext. . . .

*Krenik,* 47 F.3d at 958; *Lidge–Myrtil,* 49 F.3d at 1311 (the plaintiff "must produce 'some additional evidence beyond the elements of the *prima facie* case' that would allow a rational jury to reject [the employ-

er's] proffered reasons as a mere pretext for discrimination," quoting *Krenik* ). In *Krenik,* the court noted that the "additional facts" could be limited to evidence that would cast disbelief and a suspicion of mendacity upon the employer's proffered legitimate reasons, citing *St. Mary's Honor Ctr.,* at ——, 113 S.Ct. at 2749, but the court held that the plaintiff must produce "some additional evidence beyond the elements of the *prima facie* case to support a finding of pretext. Thus, [plaintiff's] argument that she was entitled to a full trial once both parties had met their initial burdens fails as a matter of law." *Krenik,* 47 F.3d at 959. In *Lidge–Myrtil,* the court held, first, that the plaintiff's abilities alone cannot rebut the employer's stated reasons for its action. *Lidge–Myrtil,* 49 F.3d at 1311. Next, the court rejected as inadequate plaintiff's "additional facts" in the form of a "single offhand hearsay comment by an unnamed co-worker" offered as proving discriminatory animus on the part of the employer. *Id.* Finally, the plaintiff was unable to produce persuasive evidence of disparate treatment because she could identify no comparably situated employees not of her protected class who were treated differently. *Id.*

The court will therefore consider, if Jenkins presents an adequate *prima facie* case of disparate treatment because of his race, if he has also presented "additional facts" to rebut Wal–Mart's proffer of a legitimate, non-discriminatory reason for the failure to promote him and his ultimate termination sufficient to create a genuine issue of material fact as to discriminatory intent. However, the finding of discriminatory intent is generally for the trier of fact. *Burger v. McGilley Memorial Chapels, Inc.,* 856 F.2d 1046, 1047 (8th Cir.1988).

### b. The prima facie case

▇▇▇▇▇▇ Under the *McDonnell Douglas* analysis, the plaintiff's usual burden to establish a *prima facie* case of employment discrimination is to show that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the job he or she was performing; (3) the plaintiff suffered adverse employment action, or was discharged; and (4) a nonmember of the protected class replaced the plaintiff or was not subjected to the adverse employment action.[8] *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Elliott v. Montgomery Ward & Co.,* 967 F.2d 1258, 1260 (8th Cir.1992). The Supreme Court noted that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie case proof required from [the plaintiff] is not necessarily applicable in every respect in differing factual situations." *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13.

▇▇▇▇▇▇ To prove a disparate treatment claim, the plaintiff must show that he was "similarly situated in all relevant respects" to a non-member of the protected class who was more favorably treated. *Lanear v. Safeway Grocery,* 843 F.2d 298, 300 (citing *Smith v. Monsanto Chem. Co.,* 770 F.2d 719, 722 (8th Cir.1985), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986)). In order to determine whether a plaintiff has shown that the employees involved were "similarly situated" for purposes of establishing a *prima facie* case, the court considers whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *Williams v. Ford Motor Co.,* 14 F.3d 1305, 1309 (8th Cir.1994); *Boner v. Bd. of Comm'rs of Little Rock Mun. Water Works,* 674 F.2d 693, 697 (8th Cir. 1982). It is not up to the employer to prove dissimilarity. *Lanear,* 843 F.2d at 301 (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94); *Bunny Bread,* 646 F.2d at 1254. Where a plaintiff establishes a *prima facie* case of disparate treatment, if the defendant presents a legitimate, non-discriminatory reason for the disparate treatment, and the plaintiff cannot show that reason was pretextual, the defendant is entitled to summary

---

8. Specifically regarding disparate treatment cases involving promotions, the plaintiff must carry the burden of establishing a *prima facie* case of racial discrimination by showing: (1) that he belongs to a racial minority; (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons with complainant's qualifications. *Winbush v. State of Iowa,* 66 F.3d 1471, 1480 n. 13 (8th Cir.1995) (citing *Marzec v. Marsh,* 990 F.2d 393, 395–96 (8th Cir.1993)); *Lidge–Myrtil,* 49 F.3d at 1310; *Marzec,* 990 F.2d at 395–96.

judgment. *Pierce v. Marsh,* 859 F.2d 601, 603 (8th Cir.1988).

### c. Legitimate, non-discriminatory reason and pretext

 In the second stage of the analysis, if the employer articulates a reason sufficient to rebut a *prima facie* case, the inquiry proceeds to a "new level of specificity." *White v. McDonnell Douglas Corp.,* 985 F.2d 434, 436 (8th Cir.1993) (citing *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094). In the third stage of the analytical framework, the plaintiff is entitled to the opportunity to show that the stated reason for the employer's action was "in fact pretext." *Id.* (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825). The plaintiff can show pretext either "by persuading the court that a discriminatory reason more likely motivated the employer or ... by showing that the employer's proffered explanation is unworthy of credence." *Id.* (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1094). "In short, the district court must decide which party's explanation of the employer's motivation it believes." *Id.* (citing *Aikens,* 460 U.S. at 716, 103 S.Ct. at 1482). The sufficiency of evidence to support a factfinder's determination of discrimination was described in *St. Mary's:*

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination, and ... [n]o additional proof of discrimination is *required.*

*St. Mary's,* at ——, 113 S.Ct. at 2749.

### d. Jenkins' disparate treatment claim under Title VII

 Wal–Mart has argued Jenkins has failed to establish a *prima facie* case of race discrimination under Title VII. Specifically, Wal–Mart argues Jenkins has failed to show he was qualified for the position of sporting goods department manager. Under the four factors establishing a *prima facie* case in *McDonnell Douglas,* Jenkins is African–American; therefore, he is a member of a protected class under Title VII. Furthermore, regarding the second factor, Jenkins alleges he applied for and was qualified for the position of sporting goods department manager. Wal–Mart argues that none of the supervisors had spoken with Jenkins regarding his desire to obtain this promotion. However, Jenkins maintains he spoke with his supervisors seeking the promotion to sporting goods department manager each time the position became available. Furthermore, in a letter sent by Wal–Mart to the Mason City Human Rights Commission, dated April 24, 1993, Wal–Mart admitted that management knew of Jenkins' interest in a promotion, evaluated him for the promotion, and subsequently chose someone else for the position. Regardless, whether or not Jenkins applied for these promotions appears to rely upon a credibility issue, namely, the testimony of Jenkins in contrast to the testimony of these supervisors, and would be a question subject to the factfinder's resolution. *Collier v. Budd Co.,* 66 F.3d 886, 893 (7th Cir.1995) (credibility judgment is best left to the finder of fact regarding the believability of proffered reasons in a discrimination case); *Hanover Ins. Co. v. American Eng'g Co.,* 33 F.3d 727, 732 n. 8 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986)) (on motion for summary judgment, district court should not decide questions of credibility; rather, these decisions involving credibility are reserved to the trier of fact); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994) (court should avoid credibility determinations at the summary judgment stage); *Johnson v. Bi–State Justice Ctr.,* 12 F.3d 133, 136 (8th Cir.1993) (same). Therefore, the court finds Jenkins has at least raised a material fact question regarding whether or not he applied for these promotions.

Regarding his qualifications, Jenkins previously held the position of sporting goods department manager and was demoted. However, Jenkins alleges he was demoted solely for the reasons alleged by Rusty Johnson, his assistant manager at the time, whom he further alleges was responsible for the mistakes attributed to Jenkins which were cited as reasons for his demotion. Specifical-

ly, Jenkins claims he was demoted for making errors in the gun log, but Gabel, one of the individuals who received a promotion Jenkins was denied, testified in his deposition that Jenkins taught him the correct gun book procedures. (Gabel deposition, p. 19.). Gabel also stated in his deposition that Jenkins knew more than most of the other sporting goods employees about the sporting goods department. (Gabel deposition, p. 45.). In addition, two of the candidates chosen for promotion instead of Jenkins had disciplinary sanctions. Gabel, in particular, received a confidential plan of action regarding the interference of his social life with his work prior to receiving the promotion over Jenkins. Based on this testimony of Gabel, the employment files of the candidates who ultimately received the position over Jenkins, and the allegations regarding Jenkins' prior demotion, the court finds Jenkins has raised a material question of fact regarding his qualifications for the position of sporting goods department manager.

■ Regarding the third factor, Wal–Mart admits Jenkins was rejected for the position; therefore, Jenkins has raised a material fact question regarding this factor.[9] Finally, regarding the fourth factor, the position of sporting goods department manager did remain open after Jenkins did not receive it, and Wal–Mart continued to seek applications from other persons allegedly with Jenkins' qualifications. Thus, because Jenkins has raised material fact questions regarding

each of the *McDonnell Douglas* factors, the court concludes Jenkins has raised material fact questions concerning his *prima facie* case of race discrimination.

Regarding the issue of pretext, Wal–Mart did not address this issue, nor did it articulate specific, legitimate, non-discriminatory reasons for its employment decisions regarding Jenkins. Instead, Wal–Mart focused its arguments on Jenkins' alleged inability to establish a *prima facie* case and its opinion regarding the issue of whether Jenkins' claims were time-barred. In light of this posture of the summary judgment proceedings, there is simply no need to address the pretext stage. Thus, the court turns to the evaluation of Jenkins' state law discrimination claim.

### e. Jenkins' disparate treatment under Iowa Code Ch. 216

■ Jenkins filed race discrimination claims under both federal and state law, and Wal–Mart subsequently moved for summary judgment on both of Jenkins' claims under Title VII and his claims under Iowa Code Ch. 216. Neither Wal–Mart nor Jenkins have distinguished between the discrimination claims brought under Title VII and the claims brought under Iowa Code Ch. 216, nor does it appear to the court that they have argued the Chapter 216 claims separately from the discussion of the Title VII claims. There may be good reason for this development in that Iowa courts routinely look to

---

**9.** Regarding this factor in terms of a termination, as opposed to a failure to promote, the question involves whether Jenkins was terminated or constructively discharged. Jenkins terminated his employment with Wal–Mart the same day he met with the loss prevention managers concerning Jenkins' alleged theft of a television set. Jenkins maintains he denied knowledge of the alleged theft of a television set. He further asserts he offered to take a lie detector test and asked to see any security video tapes regarding the incident. Jenkins claims Wal–Mart denied his request and ignored his offer to take a lie detector. Jenkins alleges that Wal–Mart only would accept an admission of guilt. Because Jenkins maintains he was not guilty of theft, he argues he left. The only evidence of theft derives from the uncorroborated testimony of Devin Cumberland, the customer service manager who testified that Jenkins left the store with a television set on a cart without showing the security tape in violation of Wal–Mart policy. Cumberland also testified it

was possible Jenkins was carrying out a television set from layaway for a customer and that he may, in fact, have shown the security tape to another employee working at the customer service desk at that time. Cumberland further testified he thought Wal–Mart might use these theft allegations to "legally get rid of Jenkins." In consideration of the *Bunny Bread* factors, discussed in Section IV(B)(1) above, the court finds that there are material questions of fact regarding whether a reasonable person would find the conditions created by Wal–Mart intolerable and whether Wal–Mart either consciously meant to force Jenkins to quit or could at least reasonably foresee Jenkins' termination as a consequence of its actions. *See Kriss*, 58 F.3d at 1283; *Smith*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284; *Bunny Bread Co.*, 646 F.2d at 1256. Therefore, the court concludes Jenkins has raised material fact questions regarding the occurrence of adverse employment action as required under the *McDonnell Douglas* test.

federal cases under Title VII for guidance in disposition of discrimination claims under Iowa Code Ch. 216. *See, e.g., Boelman v. Manson State Bank,* 522 N.W.2d 73, 77 (Iowa 1994) (recognizing that Iowa court has previously looked to federal cases interpreting Title VII for guidance in applying chapter 601A (now 216)); *Hy–Vee Food Stores, Inc. v. Civil Rights Comm'n,* 453 N.W.2d 512, 516 (Iowa 1990) (Iowa court borrowed framework of analysis for disparate treatment claim under Iowa Code Ch. 601A from United States Supreme Court cases applying it to Title VII cases in *Hamilton v. First Baptist Elderly Hous. Found.,* 436 N.W.2d 336 (Iowa 1989), and therefore doing the same); *Landals v. George A. Rolfes Co.,* 454 N.W.2d 891, 894 (Iowa 1990) (in the past, the Iowa Supreme Court has applied federal principles and analytical framework to civil rights cases under Iowa Code Ch. 216); *Hulme v. Barrett,* 449 N.W.2d 629, 633 (Iowa 1989) (Iowa court is guided by federal law in analysis of civil rights cases under Iowa Code Ch. 601A); *Annear v. State,* 419 N.W.2d 377, 379 (Iowa 1988) (recognizing that Iowa Code Ch. 601A is patterned after Title VII, and adopting principles found in federal cases under the federal law); *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983) (same); *Iowa State Fairgrounds Security v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (Iowa 1982) (adopting principles stated in federal Title VII disparate treatment cases for analysis of claims under Iowa Code Ch. 601A). Having concluded above that Wal–Mart is not entitled to summary judgment on Jenkins' federal claims of disparate treatment racial discrimination using the framework of analysis applicable to Title VII cases, the court now concludes that Wal–Mart is not entitled to summary judgment on Jenkins' claims of discrimination under Iowa Code Ch. 216.

### 2. Jenkins' disparate impact claim

■ Although the court has concluded Jenkins has raised material fact questions regarding his Title VII and his state law race discrimination claims under the disparate treatment theory, Jenkins has also argued that under the disparate impact theory, he has raised material fact questions regarding Wal–Mart's discriminatory policies in the workplace. Therefore, in the alternative, the court will evaluate the arguments raised by Jenkins in his resistance brief to Wal–Mart's motion for summary judgment regarding Jenkins' claims under a disparate impact race discrimination theory.

■ The United States Supreme Court first applied the disparate impact theory to a Title VII claim in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Subsequently, in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the Court developed the elements of proof for a disparate impact employment discrimination claim in a more elaborate fashion, outlining three phases through which a claim proceeds. Initially, the employee must show that an employment practice has an adverse impact on a protected group in significant disproportion to its impact on employees not within that protected group. *Albemarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. at 2375; *Griggs,* 401 U.S. at 432, 91 S.Ct. at 853.

■ After the employee has established a *prima facie* case, the burden of persuasion shifts to the employer to show the business necessity of the challenged employment practice. *Albemarle,* 422 U.S. at 425, 95 S.Ct. at 2375; *Griggs,* 401 U.S. at 432, 91 S.Ct. at 853. If the employer succeeds with its burden at the second stage, the employee must then show there are other reasonable alternatives that would result in a diminished disparate impact. *Albemarle,* 422 U.S. at 425, 95 S.Ct. at 2375.

In his resistance brief, Jenkins challenges Wal–Mart's evaluation procedures for promotion. Jenkins claims Wal–Mart's promotion procedures depend almost entirely upon the subjective evaluation and favorable recommendations of the immediate supervisor. Jenkins further asserts that all of the employees in managerial or supervisory positions from 1989 to 1994 have been white. Therefore, Jenkins argues that Wal–Mart's promotion procedure, in which African–American workers' ability to obtain promotions is dependent directly on decisive recommendations from whites, is a racially discriminatory policy that has a disparate impact on African–Americans.

The Eighth Circuit had held in previous cases that a disparate impact claim may not be based on subjective evaluation and promotion procedures. *Talley v. United States Postal Serv.*, 720 F.2d 505, 506–07 (8th Cir. 1983), *cert. denied*, 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984); *Harris v. Ford Motor Co.*, 651 F.2d 609, 610 (8th Cir.1981). However, the issue of whether an employer's practice of committing employment decisions to the unchecked discretion of white supervisory staff is subject to the disparate impact test under *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) came before the United States Supreme Court in *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988).

In *Watson*, the Supreme Court determined the disparate impact theory applies to employment decisions based on subjective criteria. *Watson*, 487 U.S. at 980, 108 S.Ct. at 2781. The Court subsequently tightened the proof requirements for disparate impact claims in *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989).[10] In addition, the *Wards Cove* decision significantly lessened the employer's burden to show a business necessity for its actions.[11] However, subsequent to the *Wards Cove* decision, Congress passed the Civil Rights Act of 1991, which expressly reinstated the law regarding the defendant's burden in a disparate impact claim as it existed before the *Wards Cove* decision.[12] *See Bradley*, 7 F.3d at 797 (citing the Civil Rights Act of 1991, Pub.L. No. 102–166, § 3, 105 Stat. 1071 (1991)). The Civil Rights Act of 1991 placed the burden of persuasion regarding business justification to the defendant employer. The 1991 Act reinstated the *Griggs* analysis, under which the burden is on the defendant employer to prove both a "compelling need" for the challenged policy, and the lack of an effective alternative policy that would not produce a similar disparate impact. *Bradley*, 7 F.3d at 797–98 (citing *Hawkins v. Anheuser–Busch, Inc.*, 697 F.2d 810, 815 (8th Cir.1983), in turn, quoting *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 705 n. 6 (8th Cir.1980) (emphasis omitted)); *see also Griggs*, 401 U.S. at 432, 91 S.Ct. at 853 (employer must show "a manifest relationship to the employment in question").

**10.** Under the *Wards Cove* standard, in the first stage of proof,

> [T]he [employee's] burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force. *The [employee] must begin by identifying the specific employment practice that is challenged. . . . Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the [employee] is . . . responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.*

*Id.* at 656, 109 S.Ct. at 2124 (quoting the plurality in *Watson*) (emphasis added). In other words, the employee must show a causal connection between the challenged employment practice and the disparate impact. In significantly limiting the role of statistics in this first stage, the Court stated the proper basis for the initial inquiry in a disparate impact case should involve a comparison between the racial composition of the jobs at issue and the racial composition of qualified persons in the labor market. *Id.* at 650–51, 109 S.Ct. at 2120–21.

**11.** Prior to *Wards Cove*, once the plaintiff established a *prima facie* case of disparate impact on the protected group, "the employer had the burden to prove a business necessity defense, that is, a 'compelling need' to maintain an employment practice for which there was no alternative." *Houghton v. SIPCO, Inc.*, 38 F.3d 953, 958 (8th Cir.1994) (citing *Kirby v. Colony Furniture Co.*, 613 F.2d 696, 705 n. 6 (8th Cir.1980)). Under the *Wards Cove* analysis, once the plaintiff had made its *prima facie* case, his employer carried the burden of producing evidence of business justification for his employment practice, with the burden of persuasion remaining on the plaintiff. *See Houghton*, 38 F.3d at 958 (citing *Wards Cove*, 490 U.S. at 659, 109 S.Ct. at 2126).

**12.** Although the Civil Rights Act of 1991 superseded the *Wards Cove* standard regarding the analysis of disparate impact claims, the Civil Rights Act of 1991 does not apply retrospectively to actions pending at the time of its enactment. *See Houghton*, 38 F.3d at 959; *Bradley v. Pizzaco of Neb., Inc.*, 7 F.3d 795, 797 (8th Cir.1993) (citing *Fray v. Omaha World Herald Co.*, 960 F.2d 1370, 1377–78 (8th Cir.1992); *Hughes v. Matthews*, 986 F.2d 1168 (8th Cir.1992); *Hicks v. Brown Group, Inc.*, 982 F.2d 295, 299 (8th Cir. 1992) (en banc), *cert. denied*, — U.S. ——, 114 S.Ct. 1642, 128 L.Ed.2d 363 (1994)). Therefore, disparate impact discrimination cases filed before the effective date of the Civil Rights Act of 1991 are governed by the *Wards Cove* decision. *Houghton*, 38 F.3d at 959. Because this action was not pending at the time of the enactment of the Civil Rights Act of 1991, the 1991 Act governs this case.

Jenkins argues in his memorandum of law that Wal–Mart's promotion procedures are discriminatory and result in a disparate impact on African–Americans in violation of both Title VII and Iowa Code Ch. 216. Wal–Mart has neglected to address Jenkins' arguments regarding a disparate impact theory of race discrimination. However, based on the reasons articulated above under Section IV(a)(2), specifically, the subjective evaluation promotion procedures of Wal–Mart and the statistical disparities alleged by Jenkins, the court finds, in the alternative, Jenkins has created material fact questions regarding the existence of a *prima facie* case of discrimination, specifically, that Wal–Mart's promotion procedure has an adverse impact on African–Americans in significant disproportion to its impact on employees not within that protected group. Therefore, the court concludes Jenkins has raised material fact questions regarding his race discrimination claims under a disparate impact theory, as well as under a disparate treatment theory.

### C. Jenkins' Defamation Claim

Wal–Mart has moved for summary judgment on Jenkins' defamation claim on the ground that it had a qualified privilege to communicate the allegedly defamatory statements regarding the alleged theft of a television set to those members of Wal–Mart's managerial staff necessary to properly address the allegations of theft against Jenkins. Jenkins asserts Wal–Mart had no qualified privilege because Wal–Mart made these allegations against Jenkins based on one customer service manager's uncorroborated account of an alleged theft, and as such, the allegations were based on a total lack of good faith. As such, Jenkins claims Wal–Mart acted with actual malice, and the qualified privilege is destroyed.

### 1. Defamation and defamation "per se"

▆▆▆ The law of defamation consists of the twin torts of libel and slander, and the gist of a defamation action is the publication of written or oral statements which tend to injure a person's reputation and good name. *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994) (citing W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 111, 15 771 (5th ed. 1984)). Slander generally consists of the oral publication of defamatory matter.

*Id.* Libel in Iowa is the "malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business." *Vinson v. Linn–Mar Community Sch. Dist.*, 360 N.W.2d 108, 115 (Iowa 1984). Jenkins' allegations here appear to be primarily assertions of slander by oral statements of Wal–Mart managers to other managers concerning Jenkins' alleged theft of a television set. Iowa recognizes the common-law rule that republication of a defamatory statement is subject to the same liability as the original statement. *Jones v. Palmer Communications, Inc.*, 440 N.W.2d 884, 893 (Iowa 1989); *Morse v. Times–Republican Printing Co.*, 124 Iowa 707, 717–18, 100 N.W. 867, 870–71 (1904). Furthermore, a person making a defamatory statement "[is], and should be, liable for damages resulting from a repetition or republication of the [defamatory] statement when such repetition or republication was reasonably foreseeable to the person making the statement." *Brown v. First Nat'l Bank of Mason City*, 193 N.W.2d 547, 555 (Iowa 1972).

▆▆▆ Where there is no communication to the general public, but instead the statements are made only to the plaintiff, and the plaintiff disseminates the statements, there is no defamation. *McBride v. City of Sioux City*, 444 N.W.2d 85, 92 (Iowa 1989); *Belcher v. Little*, 315 N.W.2d 734, 738 (Iowa 1982). The plaintiff cannot create a cause of action by communicating defamatory statements to others unless under a strong compulsion to do so. *Belcher*, 315 N.W.2d at 738. Whether such compulsion exists must be decided by the finder of fact under the circumstances in each case and must be based on the introduction of substantial evidence. *Id.*

▆▆▆ In order to prevail on a defamation claim, a plaintiff must ordinarily prove that the statements were made with malice, were false, and caused damage. *Vinson*, 360 N.W.2d at 115 (citing *Vojak v. Jensen*, 161 N.W.2d 100, 104 (Iowa 1968)). However, some statements, in a special category of defamation "per se," are actionable without

proof of malice, falsity, or special harm. *Lara,* 512 N.W.2d at 785; *Vinson,* 360 N.W.2d at 115–116; *Kelly v. Iowa State Educ. Ass'n,* 372 N.W.2d 288, 295 (Iowa App. 1985). Words are defamatory per se if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have libelous effect. *Vinson,* 360 N.W.2d at 116 (citing *Haas v. Evening Democrat Co.,* 252 Iowa 517, 107 N.W.2d 444, 447 (1961)). Among such statements are defamatory imputations affecting a person in his or her business, trade, profession, or office. *Lara,* 512 N.W.2d at 785; *Vojak v. Jensen,* 161 N.W.2d 100, 104 (Iowa 1968); *Galloway v. Zuckert,* 447 N.W.2d 553, 554 (Iowa App.1989), *cert. denied,* 494 U.S. 1057, 110 S.Ct. 1526, 108 L.Ed.2d 765 (1990). In addition, accusing a person of a crime is defamatory per se when the crime charged is indictable, and involves moral turpitude or subjects one to a sentence of incarceration. *Rees v. O'Malley,* 461 N.W.2d 833, 835 (Iowa 1990); *Amick v. Montross,* 206 Iowa 51, 57, 220 N.W. 51, 54 (1928).

### 2. *Qualified privilege*

■■■■ Although Jenkins has alleged defamation per se, because the allegedly defamatory statements concerned accusations that Jenkins was a thief who stole merchandise from his place of employment, the law recognizes circumstances may arise when a person, in order to protect his or her own interest or the interest of others, must make statements about another which are defamatory or defamatory per se, and in such circumstances a qualified privilege bars liability. *Vojak,* 161 N.W.2d at 104; *Higgins v. Gordon Jewelry Corp.,* 433 N.W.2d 306, 308 (Iowa App.1988). Defendants may raise qualified privilege as a defense if it can show

that they made the allegedly defamatory statements in the proper circumstances:

> a qualified privilege applies to statements without regard to whether they are defamatory per se when they are made on an appropriate occasion in good faith on a subject in which the communicator and addressee have a shared interest, right or duty.

*Vinson,* 360 N.W.2d at 116; *see also Fischer v. UNIPAC Serv. Corp.,* 519 N.W.2d 793, 795 (Iowa 1994); *Lara,* 512 N.W.2d at 785. The statements must be made "in a manner and under circumstances fairly warranted by the occasion." *Lara,* 512 N.W.2d at 785; *Knudsen v. Chicago & North Western Transp. Co.,* 464 N.W.2d 439, 442 (Iowa 1990); *Rees v. O'Malley,* 461 N.W.2d 833, 837 (Iowa 1990).

■■■■ The privilege must not be abused or exceeded. *Lara,* 512 N.W.2d at 786. Therefore, the privilege is lost if the statements are not made in good faith, *Lara,* 512 N.W.2d at 786, *Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98, 104 (Iowa 1985), or are made with actual malice. *Knudsen,* 464 N.W.2d at 443; *Vinson,* 360 N.W.2d at 116. So long as good faith is present,

> the person making the statement is not limited to facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not. But of course, any such communication is actionable if made maliciously.

*Haldeman,* 376 N.W.2d at 104 (quoting 50 Am.Jur.2d *Libel & Slander* § 273, at 791). As distinct from legal malice and from actual malice under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964),[13] actual malice in this context

---

**13.** Under the constitutional standards established in *New York Times,* "actual malice" must be shown before a private figure plaintiff may recover punitive damages, *In re IBP Confidential Bus. Documents Litigation: Bagley v. Iowa Beef Processors, Inc.,* 797 F.2d 632, 647 (8th Cir.1986) (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986)), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1293, 1294, 94 L.Ed.2d 150 (1987) and before a public figure plaintiff may recover any damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 335–36, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789 (1974). "Malice" under *New York Times*

does not refer to ill will. *Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1433 (8th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990). The primary focus must be on the defendant's attitude toward the truth of the statements, rather than on the defendant's attitude toward the plaintiff. *Id.* A statement is made with "actual malice" if it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Bagley,* 797 F.2d at 643 (citing *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–26). Actual malice in this context must be established by clear and convincing evidence. *Id.*

does depend on the motive for the statement. Actual malice requires proof that the statement was made with malice in fact, ill-will or wrongful motive.

*Id.* at 103–04 (citing *Vinson,* 360 N.W.2d at 117); *Benishek v. Cody,* 441 N.W.2d 399, 403 (Iowa App.1989). In the absence of actual malice, the qualified privilege extends even to statements that are not true. *Vojak,* 161 N.W.2d at 105; *Benishek,* 441 N.W.2d at 402 (citing *Vojak*). The privilege does not extend to publication to the general public. *Rees,* 461 N.W.2d at 837 (citing *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 552 (Iowa 1972)).

■ In summary, the elements of the qualified privilege defense are that: (1) the statements were made in good faith; (2) the defendant had an interest to be upheld; (3) the statements were limited in their scope to this purpose; (4) the statements were made on a proper occasion; and (5) publication was in a proper manner and to proper parties only. *Knudsen,* 464 N.W.2d at 442 (citing *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 552 (Iowa 1972)).

■ Ordinarily, it is for the court to decide whether the privilege is available for the communication in question. *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547 (Iowa 1972); *Higgins,* 433 N.W.2d at 308; Restatement (Second) of Torts § 619(1), p. 316 (1977). The burden is on the defendant to establish the existence of a qualified privilege. *Lara,* 512 N.W.2d at 785; *Rees,* 461 N.W.2d at 837. Qualified privilege is an affirmative defense that must be pleaded. *Vinson,* 360 N.W.2d at 116; *Higgins,* 433 N.W.2d at 311 (quoting *Vinson*). *See also Spencer v. Spencer,* 479 N.W.2d 293, 296 (Iowa 1991) (qualified privilege one of "affirmative defenses" to defamation on which court properly instructed jury), *cert. denied,* 506 U.S. 840, 113 S.Ct. 120, 121 L.Ed.2d 76 (1992). The court concludes that where no genuine issue of material fact exists to deny an available privilege, for example on the grounds of actual malice or lack of good faith, the court may enter summary judgment in favor of the defendant.

### 3. *Jenkins' defamation claim*

■ Jenkins has alleged that even if Wal–Mart's statements were made under a qualified privilege, these statements were made with actual malice or a lack of good faith, and as such, the defense of qualified privilege does not apply here. The statements made by Wal–Mart supervisors regarding allegations of theft were based on the uncorroborated testimony of Devin Cumberland, a customer service manager. Cumberland claimed he had seen Jenkins leave the store with a television set on a handcart without showing the security tape which was required by store policy. However, Cumberland also testified in his deposition that the sporting goods department was located next to layaway, and it was conceivable that Jenkins could have been taking the television set outside at the request of a customer. Cumberland further testified it was possible Jenkins showed the security tape to another employee at customer service. Furthermore, Cumberland indicated there was no television box or cardboard material found in the store parking lot as claimed by loss prevention personnel. Cumberland even stated in his deposition that he believed Wal–Mart management might use these allegations as an opportunity to "legally get rid of Jenkins." (Cumberland deposition, p. 23.). Also, Jenkins claims the loss prevention department never discovered any records indicating that a television set of any size or brand was missing from the store's inventory. Based on the testimony of Cumberland, whose same testimony supposedly supported Wal–Mart's allegations of theft, and the lack of additional evidence offered by Wal–Mart regarding the good faith of these statements, the court finds Jenkins has raised material fact questions regarding the lack of good faith surrounding Wal–Mart's allegedly defamatory statements and regarding the inapplicability of Wal–Mart's defense of qualified privilege. Thus, Wal–Mart has failed to establish its entitlement to summary judgment on Jenkins' defamation claim.

### V. CONCLUSION

Based on its review of the summary judgment record as a whole, the court finds Jen-

kins has created a material fact question regarding the issue of whether his race discrimination claims are time-barred and regarding the existence of a continuing violation. Furthermore, the court concludes Jenkins has raised material fact questions regarding his claims of race discrimination under Title VII and under Iowa Code Ch. 216, not only under a disparate treatment theory, but in the alternative, under a disparate impact theory of discrimination. Finally, the court concludes Jenkins has raised a material fact question that Wal–Mart acted with a lack of good faith, and thus, cannot invoke the defense of qualified privilege regarding Jenkins' common-law defamation claim. Therefore, the court denies Wal–Mart's motion for summary judgment on all counts.

**IT IS SO ORDERED.**